Gregory Lee VILLANUEVA, Appellant

v.

The STATE of Texas.

Nos. PD–0718–06, PD–0719–06.

Court of Criminal Appeals of Texas.

June 27, 2007.

ishment violates the Double Jeopardy Clause.

## FACTS AND PROCEDURAL POSTURE

In a two count indictment, the appellant was charged with intentionally or knowingly causing serious bodily injury to his infant son by the acts of shaking him and striking him against an unknown object, and with intentionally or knowingly causing serious bodily injury to his infant son by omitting to seek medical attention for him once he had thus injured him, having a legal duty to do so. Both counts were submitted to the jury, which convicted the appellant of both, and eventually assessed his punishment for each conviction at 50 years' confinement in the penitentiary and a fine of $5,000. As the following recitation of facts will show, the identical serious bodily injury that the evidence circumstantially shows the appellant committed by his actions also formed the basis for his conviction for failing to seek medical attention when he had a duty to do so.[3]

At the time of the offense, the appellant was living with his girlfriend, Amanda Legg, and their two-month-old son, G.V., and with Legg's aunt and several other people in a single-wide trailer in Somerville. In the late evening of July 29, 2003, Legg was bathing G.V. in the bathtub. After a while, she asked the appellant come take G.V. back to the bedroom that they shared in the trailer while she finished her own bath. Through the wall she heard "the bed frame squeaking, really loud." She got out of the bathtub to investigate and found G.V. awake and respon-

Stephen Gustitis, for Gregory Lee Villanueva.

Stephen Gustitis, Bryan, for Appellant.

Stephen Christopher Taylor, Attorney Pro Tem, Humble, Matthew Paul, State's Atty., Austin, for State.

## *OPINION*

PRICE, J., delivered the opinion of the Court in which MEYERS, KEASLER, HERVEY, HOLCOMB and COCHRAN, JJ., joined.

In a single proceeding, the trial court authorized the jury in this cause to convict the appellant for both injury to a child by act and injury to the same child by omission.[1] We granted the appellant's petitions for discretionary review to determine whether his conviction and punishment for both of these offenses violated the protection of the Fifth Amendment to the United States Constitution against being twice punished for the same offense in a single criminal proceeding. We recently held, in *Jefferson v. State*,[2] that the Legislature intended that injury to a child by act and injury to a child by omission should be treated as a different means of committing the same offense, rather than as discrete criminal offenses. We now hold similarly that, on the particular facts of this case, the appellant's second conviction and pun-

---

1. *See* TEX. PENAL CODE § 22.04(a)(1) ("A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child ... serious bodily injury[.]").

2. 189 S.W.3d 305 (Tex.Crim.App.2006).

3. A detailed recitation of the facts may be found in the court of appeals's opinion. *Villanueva v. State*, 194 S.W.3d 146, 150–51 (Tex.App.-Houston [1st] 2006).

sive at the foot of the bed. She dressed and went out to the kitchen, leaving G.V. alone in the bedroom with the appellant for the next 30 to 45 minutes.

Returning to the bedroom, Legg found G.V. "limp" and making "grunting" noises, and noticed for the first time that he had "a bruise on his inner-right ear and down the right side of his face and on the left side of his face." Legg told the appellant "that [she] wanted to take [G.V.] to the hospital because something wasn't right, and [the appellant] said if we took him to the hospital that they would see the bruises and call in CPS and they would blame us for it." During the argument the appellant took G.V. from Legg, and as the appellant held G.V., G.V. experienced an episode in which "he bowed his back and put his chest out." G.V. had experienced a similar seizure-like episode about a week earlier, and Legg had resolved to take G.V. to the hospital if it should ever happen again. She "panicked and ... ran down the hallway to go call for help[.]" The appellant followed her, took her by the arm, and led her back to the bedroom. Legg decided to wait for the appellant to fall asleep and then seek help, but she fell asleep before the appellant did.

The next morning when they awoke, G.V. was running a high fever, and one of his eyes "was off to the right and it wasn't moving." Legg's aunt called the pediatrician, who advised that they place G.V. in a bath at room temperature to reduce the fever, and then immediately bring him to the clinic. Legg and the appellant followed these directions, and G.V. was taken first to the pediatrician's clinic, then to an emergency room in Brenham, and was finally life-flighted to the Children's Hospital in Austin. He exhibited symptoms of shaken-baby syndrome, including retinal hemorrhaging and intracranial bleeding, and six days later, on August 5, 2003, he died. The jury was authorized in separate application paragraphs of the jury charge to convict the appellant of causing serious bodily injury to G.V., by act and by omission respectively, and, in separate verdicts, it did so.

The appellant appealed both convictions. On appeal he argued, *inter alia*, that his punishment for serious bodily injury of his son under both counts of the indictment violated double jeopardy. The court of appeals rejected this contention. First, the court of appeals observed that it is possible for a criminal defendant to commit two violations of the same statute against the same victim in a single day; under those circumstances, though the indictments might appear identical, the proof would show that two separate offenses were committed for jeopardy purposes.[4] The court of appeals reasoned that, similarly, the appellant had committed separate offenses because "the record contains evidence that appellant twice committed injury to a child: first, by shaking [his son] with his hands or striking him with an unknown object, and then, by failing to seek medical treatment for [his son] after he had inflicted those injuries upon him."[5] The court of appeals placed principal reliance upon our opinion in *Vick v. State*[6] in holding that the appellant suffered no jeopardy violation. On the particular facts of this case, we will reverse.

## ANALYSIS

In *Ex parte Kopecky*, we observed:

---

4. 194 S.W.3d at 151–52. For this proposition the court of appeals relied upon *Luna v. State,* 493 S.W.2d 854, 855 (Tex.Crim.App.1973).

5. *Id.* at 152.

6. 991 S.W.2d 830 (Tex.Crim.App.1999).

The Fifth Amendment double jeopardy clause protects against multiple prosecutions for the "same offense" following acquittal or conviction. It also protects against multiple punishments for the "same offense." See, e.g., *Ex parte Herron*, 790 S.W.2d 623, at 624 (Tex.Cr. App.1990). The constitutional meaning of "same offense" "may vary" depending upon which of these protections is at issue. See *Whalen v. United States*, 445 U.S. 684, at 700, 100 S.Ct. 1432, at 1442, 63 L.Ed.2d 715, at 729 (1980) (Rehnquist, dissenting). At any rate, applicant here pled guilty to both offenses in a single proceeding. We are therefore not concerned with issues of multiple prosecutions for the "same offense."[7] The same is true in the instant case. Because the appellant received two punishments in the course of a single proceeding, we are only concerned with the meaning of "same offense" in that context.

■ In that context, the classical test for determining sameness embodied in the United States Supreme Court's opinion in *Blockburger v. United States*[8] operates only as a rule of statutory construction, a mechanism for determining legislative intent. Application of *Blockburger* does not serve, however, to negate otherwise clearly expressed legislative intent. As we made clear in *Ex parte Kopecky*, "[t]he *Blockburger* test does not operate ... to trump 'clearly expressed legislative intent.'"[9] And as we further clarified in *Ervin v. State*, "the *Blockburger* test cannot authorize two punishments where the legislature

clearly intended only one."[10] The ultimate inquiry is simply whether the Legislature intended that the defendant suffer more than one punishment.[11]

In *Jefferson v. State*, we addressed the identical penal code provision involved in this case, inquiring about the legislative intent with respect to the issue of jury unanimity. Relying principally upon the United States Supreme Court's opinion in *Richardson v. United States*,[12] we specifically held that the Legislature intended that the alternative ways of committing injury to a child, *viz:* by act or by omission, constitute alternative means of committing the same offense, not elements of two separate offenses. For this reason we held that the jury need not be unanimous as to which alternative means of committing the offense the defendant was guilty in order to attain unanimity for Sixth Amendment purposes. We doubt that the Legislature would have meant for us to construe the "act or omission" alternative of Section 22.04(a) of the Penal Code as merely alternative means of committing the same offense for jury-unanimity purposes, but as full-blown separate offenses, authorizing multiple punishments, for purposes of double-jeopardy analysis.

Like the court of appeals, the State relies upon our opinion in *Vick v. State* to argue that the Legislature did intend to carve out separate offenses. In *Vick* we were called upon to decide whether the Legislature intended to allow more than one prosecution from separate instances of

---

7. 821 S.W.2d 957, 958 (Tex.Crim.App.1992).

8. 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

9. 821 S.W.2d at 959, *citing Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). *See also Garza v. State*, 213 S.W.3d 338, 351–52 (Tex.Crim.App. 2007).

10. 991 S.W.2d 804, 807 (Tex.Crim.App.1999).

11. *Id.* at 814.

12. 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999).

aggravated sexual assault of a child, all defined in the same penal statute and all committed during the same criminal transaction.[13] We held that the legislative intent was to permit more than one prosecution, emphasizing, *inter alia*, that Section 22.021 of the Penal Code "is a conduct-oriented offense in which the legislature criminalized very specific conduct of several different types."[14] The State argues that Section 22.04(a) defines a similarly "conduct-oriented" offense. But we expressly said otherwise in *Jefferson*, observing instead that our case law "supports a decision that the essential element or focus of the statute is the result of the defendant's conduct (in this case, serious bodily injury to a child) and not the possible combinations of conduct that cause the result."[15]

In *Ervin*, we promulgated a list of considerations relevant to the determination of legislative intent in the multiple punishments context.[16] Each factor we listed cuts in favor of a conclusion that the Legislature intended that injury to a child by act or omission constitutes the "same" offense for jeopardy purposes. Both act and omission are contained within the same penal section—indeed, the same penal *sub* section. They are phrased in the alternative. The offense is called the same, whether committed by act or omission, and the punishment range is essentially identical.[17] As we explained in *Jefferson*, the "gravamen" of the offense is the same; the statute focuses on the result

caused, without criminalizing any particularized conduct by which that result may have been caused. Moreover, the statute employs a kind of "imputed theory of liability," in the sense that it makes an offender equally criminally liable whether he actually engaged in the conduct that caused the result, or alternatively, failed to take measures to avert that result, even if he was not the actor or agent initially responsible for inflicting the injury. Taken together, and in combination with our holding in *Jefferson*, these factors convince us that the Legislature intended that serious bodily injury committed against the same victim at the same time should be considered the same offense for purposes of the double-jeopardy prohibition against multiple punishments regardless of whether that injury to that victim resulted from the actor's act, his omission, or by a combination of his act and omission.

On the facts of the instant case, the appellant prevented Legg from taking G.V. to the hospital right after he apparently engaged in the conduct that caused the injury. But by the next morning, when G.V.'s condition had obviously worsened, the appellant did nothing to prevent Legg from taking G.V. in for treatment—indeed, he accompanied them. In finding no double-jeopardy violation on these facts, the court of appeals also relied upon this Court's opinion in *Luna v. State*,[18] in which we held it permissible to convict a defendant for two violations of the same statutory provision on the same day, so long as

13. 991 S.W.2d at 832.

14. *Id.*

15. 189 S.W.3d at 312.

16. 991 S.W.2d at 814.

17. *See* TEX. PENAL CODE § 22.04(e), (f) & (g). Serious bodily injury to a child, whether by act or omission, is a first degree felony if

committed intentionally or knowingly, and a second degree felony if committed recklessly. The only difference is that it is not an offense at all to commit injury to a child by omission with criminal negligence, while criminally negligent injury to a child by act is defined as a state jail felony.

18. 493 S.W.2d 854, 855 (Tex.Crim.App.1973).

the State can prove that two separate and discrete incidents occurred on that day comprising two violations of the same statutorily defined offense. Had the appellant continued to prevent Legg from taking G.V. to the hospital on the morning of July 30th, when G.V.'s condition was obviously deteriorating and it was apparent that he might suffer further serious bodily injury absent medical intervention, we think that the principle in *Luna* could well apply. Under those hypothetical circumstances, it could reasonably be said that the failure to seek treatment for G.V.'s apparent injuries resulted in a separate and discrete, or at least incrementally greater, injury for which the appellant could also be held criminally accountable without violating double jeopardy. But here we can point to no omission that caused any injury beyond that which the appellant had caused by his act. Consistent with our holding in *Jefferson* and application of the *Ervin* analysis for determining legislative intent, we hold that, on the particular facts of this case, the appellant cannot be punished for both his act and his omission. The act and omission were simply two means of alleging and/or proving the same offense for double-jeopardy purposes.

### DISPOSITION

 We hold that punishing the appellant in the same proceeding for injury to a child by act and injury to a child by omission violated his double-jeopardy protection. The remedy is to retain the "most serious" offense—that is to say, the offense for which the sentencing entity assessed the highest punishment—and set aside the other.[19] In the instant case, the jury assessed an identical term of years and fine for each conviction. No restitution was assessed for either conviction. However, the trial court entered an affirmative finding of use of a deadly weapon in the judgment of conviction for injury to a child by act, but not for the judgment of conviction for injury to a child by omission. Under these circumstances, we hold that the conviction for injury to a child by omission should be vacated.

Accordingly, in our cause number PD–718–06, we affirm the judgment of the court of appeals in its cause number 01–04–01070–CR, which affirmed the trial court's judgment of conviction for injury to a child by act. However, in our cause number PD–719–06, we reverse the judgment of the court of appeals in its cause number 01–04–01072–CR, which affirmed the trial court's judgment for injury to a child by omission. We remand the cause to the court of appeals with instructions to vacate the judgment of conviction for injury to a child by omission.

COCRHAN, J., filed a concurring opinion.

KELLER, P.J., filed a dissenting opinion.

WOMACK and JOHNSON, JJ., concurred in the result.

COCHRAN, J., concurring.

I join the majority opinion. I agree that, as we so recently reiterated in *Jefferson v. State*,[1] the gravamen of the offense of injury to a child is the result of the criminal conduct—the serious bodily injury or death suffered by the victim—not whether that injury was caused by an affirmative act or a failure to act.[2]

---

**19.** *Ex parte Cavazos*, 203 S.W.3d 333, 337 (Tex.Crim.App.2006).

**1.** 189 S.W.3d 305 (Tex.Crim.App.2006).

**2.** *Id.* at 312 ("the essential element or focus of the [of injury-to-a-child] statute is the result of the defendant's conduct (in this case, serious bodily injury to a child) and not the possible

The "shaken baby" death[3] of seven-week-old Greg was a despicable, but all-too-frequent, crime that is repeated in Texas homes every year. The evidence showed that appellant caused his infant son's death by first shaking him so violently (and perhaps hitting him against some hard object such as a wall) that he suffered a massive brain hemorrhage and then by failing to seek medical treatment for that grievous injury. But for appellant's crimi-

nal act of violently shaking Greg, that child would not have died.[4] It is conceivable, though not proven, that Greg might have survived in a persistent vegetative state had his massive brain injuries been treated immediately.[5] The jury in this case recognized the enormity of that crime and punished appellant accordingly with a sentence of fifty years' imprisonment and a deadly-weapon finding.

combinations of conduct that caused the result").

3. Dr. Keith Kerr of the Children's Hospital of Austin, where Greg was life-flighted, testified that "shaken baby syndrome" is frequently identified by the existence of tell-tale retinal hemorrhages like those Greg suffered:

The retinal hemorrhages are of an intensity that just can't be done by many things. In the majority of the cases it's a severely shaken baby. You know, if you fall from a table or fall from a bed or in a car accident, you know, you survive the car accident, or maybe fall off a bike, those things don't do this. The amount of force is unbelievable that requires this sort of damage. And the brain injury is obviously reflective of the fact that the child has been badly injured.

You know, sometimes it's not so much the bleeding in the brain of things like that, it's the fact that the brain was ripped apart with a violent shaking that causes the brain to swell, cause the soft spot to come up and then the eye exam is reflective of what went on in the brain. So it's a very specific thing to see in children who are badly shaken.

After discussing the "typical" shaken-baby scenario, Dr. Kerr noted

Well, typically what's talked about is that someone was so angry that they shake and then they throw. But shaking of any sort so severely as to cause retinal hemorrhages, it would certainly be enough to cause these injuries, but whether they're thrown against something, that would just be one more insult.

Dr. Kerr stated that, "based on the type of injuries we saw on the scan of [Greg's] brain and just how the baby was acting, you know, it suggested that the prognosis was going to be poor." Nonetheless, the doctors treated Greg aggressively as they do "every single

child that comes through the door trying to allow them to survive. So every patient will get maximum therapy in an effort to try to allow them enough time to heal." But after several days the doctors and family agreed that Greg "has a dismal diagnosis, [and thus they were] considering withdrawing support since outcome is poor and outlook is hopeless." They withdrew the life-support mechanisms and Greg died the next day.

4. At least not on the day that he did die. There was significant evidence that little Greg had been severely mistreated even before this fatal incident. Part of appellant's purported rationale for his delay in seeking medical treatment was so that the doctors could not see another "healing" bruise on the back of his head. Appellant told his girlfriend, Amanda Legg, that they shouldn't take Greg to the hospital even though he was obviously severely injured, limp, and suffering from bruise marks on his inner-right ear and face because Child Protective Services personnel would be called and they would blame appellant and Amanda Legg for child abuse.

The medical examiner's autopsy report indicated that Greg had previously suffered rib fractures which were in the process of self-repairing.

5. Dr. Kerr's testimony indicated that Greg was so violently shaken that he was brain dead: "The brain activity itself was none, and that just goes along with how bad the injury was." Dr. Kerr had previously explained that "The brain is very fragile. Some people may compare it to the consistency of jello, and if the amount of force that an adult person can sort of focus on a brain is not nearly—I mean, it can be a great deal to the point that the baby can become brain dead, and that's with no visual signs of abuse."

But appellant did not commit two separate and distinct offenses of injury-to-a-child. Little Greg could die but once. And it is his death that was the result of appellant's criminal conduct, whether committed by an affirmative act or by the failure to act. As we explained in *Jefferson*, a jury need not be unanimous on whether the serious injury suffered by children such as Greg is the result of an act or omission because "[t]hese acts and omissions all involve the same injury to the same child during the same transaction with a similar level of culpability."[6] Thus, "the acts or omissions that combine to establish the offense in this particular case are 'basically morally and conceptually equivalent.'"[7] In *Jefferson*, we cited out-of-state cases which had held the same.[8] If the jury need not be unanimous on whether Greg's death was caused by affirmative act or omission, then it inexorably follows that double jeopardy principles bar two injury-to-a-child convictions for that one death.

The State, both at trial and on appeal, was laboring under the mistaken belief that the offense of injury to a child is a "conduct" offense, not a "result" offense.[9] But this Court had correctly held, in 1985, that injury to a child is a "result oriented" crime.[10] That issue is settled. Therefore, the State could not obtain two injury-to-a-child convictions for the single death of Greg.

On the other hand, it is entirely possible that, in an appropriate case, the State could obtain two such convictions if a child suffers two distinct serious bodily injuries. For example, suppose that a parent intentionally, knowingly, or recklessly pokes his finger in his child's eye and causes the child to go blind. That is a serious bodily injury. The crime of injury to a child is complete. Suppose also that the parent then fails to seek medical assistance for that eye injury. As a result of that failure, the eye socket becomes infected, the infection travels to the brain, and the child suffers irreversible brain damage. This is a separate serious bodily injury, an injury that would not have occurred but for (1) the original affirmative act of poking the child's eye, *and* (2) the separate criminal conduct of failing to seek medical attention for the already-injured eye. In this instance, the parent is criminally liable for two distinct injuries, neither of which would have occurred but for the parent's conduct. Double jeopardy would not bar two convictions, but each conviction would require a separate and unanimous jury verdict.

---

6. *Jefferson*, 189 S.W.3d at 313.

7. *Id.*

8. *Id.* at n. 11.

9. The State begins its Brief by stating, "Injury to a child is a conduct-oriented statute proscribing several different types of conduct." This is a false premise and, unfortunately, led the State (and the court of appeals) into relying upon *Luna v. State*, 493 S.W.2d 854 (Tex. Crim.App.1973), a double jeopardy case involving multiple sales of heroin. The crime of delivery of a controlled substance is a conduct-oriented offense and thus each act of delivery is a separate and distinct offense. With result-oriented offenses, like murder or injury to a child, double jeopardy principles apply to the specific result (death or injury), not the number or type of acts that led to the specific result.

10. *See Alvarado v. State*, 704 S.W.2d 36, 39 (Tex.Crim.App.1985) (stating that the statutory offense of injury to a child does not specify the "nature of the conduct"; thus that conduct "is inconsequential (so long as it includes a voluntary act) to commission of the crimes. What matters is that the conduct (whatever it may be) is done with the required culpability to effect the *result* the Legislature has specified.").

In "shaken baby" cases, it is conceivable that the State could obtain two separate convictions for two separate serious bodily injuries. If the evidence clearly showed that the affirmative act of shaking the baby caused one specific injury (e.g., retina detachment, broken ribs, temporary brain swelling), and that the failure to seek immediate medical attention for that original injury caused death (or permanent brain damage) which otherwise would not have occurred but for the failure to take the child to the hospital, these are two discrete serious bodily injuries.

There was, however, no such evidence in this case that neatly carved up little Greg's injuries into "affirmative act" injuries and "omission" injuries. Indeed, there would rarely be such a division of injuries in "shaken baby" cases. That may well be part of the reason why the Legislature drafted the injury-to-a-child statute in the manner it did—the State need not prove precisely which act or omission, what precise manner or means, caused the baby's death or serious bodily injury. It is the result of the criminal conduct that is a gravamen of the offense, and the crime itself is so grave that it is a first-degree offense, punishable by 5–99 years or life in prison.

KELLER, P.J., dissenting.

The Court says, essentially, that appellant was not guilty of two offenses because his baby sustained only one injury, and the injury was not aggravated by the failure to get medical help. The Court seems to agree that if appellant's failure to get medical help had caused a different injury, or caused the injury to worsen, he could be held criminally liable for failing to get help. Even if a second, or worse, injury is required in order to sustain a conviction for a second offense, I think the evidence here supports such a finding.

It is pretty clear that seven week old Greg Jr., was shaken violently late at night, which caused shearing of blood vessels in his brain. When he was first injured, the corner of his lips were blue, but he was moving and his eyes were open. Thirty to forty-five minutes later, the baby was making grunting noises and his body was limp. While appellant was arguing with the baby's mother about whether to go to the hospital, the baby "bowed up." Appellant would not let the mother take the baby to the hospital.

By the next morning, Greg Jr. had a high fever and one of his eyes was off to the right and not moving. At the hospital, his brain had swollen to the point that the soft spot on his head was bulging, his pupils were fixed and dilated, and he was having trouble breathing. He had "lots of edema because the injury was several hours old." His medical condition deteriorated. His brain continued to swell and he continued to get worse. The examination of the baby was suggestive of a lack of oxygen as well as injury to the brain itself. The autopsy showed that sutures on his skull were widely separated, which meant that the brain had swelled and enlarged them. He also had an older head injury and older, healing broken ribs.

There was testimony that when a baby is shaken, there is usually an onset of problems around the time of the shaking. After that, it gets "progressively" worse. One witness used the example of a sprained ankle to describe the progression of swelling: the moment that a person sprains his ankle there is no swelling, but some time over the next few hours the swelling occurs.

Greg Jr. was treated for his injuries. He was treated with seizure medicine and his eye deviation improved. His doctor planned to put a tube in the baby's skull to allow for fluid to be removed in the hope of

giving the brain more room to swell. He was put on a ventilator. The doctors were going to try to give him medicine to adjust for possible excessive urine output. There was testimony that the hospital staff administered aggressive treatment to this child and to all children, "in an effort to try to allow them enough time to heal" and to try to allow them to survive.

This evidence, not to mention common sense, suggests that earlier treatment *might* have allowed Greg Jr. to live. The unnecessary delay allowed his brain to swell for hours. By the time he reached the hospital, his brain had already swollen to the extent that the top of his head was bulging out. His condition clearly worsened overnight. Though there is no specific testimony that Greg Jr. would have survived his injuries if he had received faster treatment, neither is there testimony that he was doomed from the first moment.

The legislature has shown a willingness to impose additional criminal liability for a person's failure to mitigate the results of his (or others') conduct. Failure to render aid is a stand-alone offense, as is failure to report a felony and failure to stop and render aid, to mention but a few examples. These statutes reflect the legislature's effort to encourage the amelioration of injury. The Court's opinion thwarts this common-sense proposition.

In this sad case, appellant committed not one crime, but two.

I respectfully dissent.[1]

---

1. I note also that, in vacating the conviction for injury to a child, the Court has acted contrary to the holding in *Ex parte Cavazos*, 203 S.W.3d 333 (Tex.Crim.App.2006) that parole eligibility may not be considered in making such decisions and has adopted the position of my concurring opinion in that case.