

# NUMBER 13-14-00335-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

BENNY TORRES MEDRANO,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                      Appellee.

On appeal from the 92nd District Court
of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides**
**Memorandum Opinion by Chief Justice Valdez**

A jury convicted appellant Benny Torres Medrano of injury to a child by criminally negligent conduct, a state-jail felony. *See* TEX. PENAL CODE ANN. § 22.04(g) (West, Westlaw through 2017 1st C.S.). The trial court sentenced Medrano to two years in state jail. By two issues, Medrano contends: (1) the jury charge allowed the jury to convict on less than a unanimous verdict; and (2) trial counsel was ineffective. We affirm.

## I.  BACKGROUND

### A.  The Accusation

The State charged Medrano with one count of first-degree injury to a child, alleging that Medrano "intentionally or knowingly cause[d] serious bodily injury to [M.M.[1]], a child 14 years of age or younger, by a manner and means unknown or unknowable to the Grand Jury."  The following evidence was adduced at trial.

### B.  State's Case-in-Chief

Medrano lived with his girlfriend Christi Garza and their three-month old daughter, M.M., in a mobile home.  One morning, Medrano's aunt noticed swelling on M.M.'s forehead while babysitting the child.  By noon that day, Medrano and Garza took M.M. to the hospital where X-rays uncovered a total of thirteen fractures:  three on the skull, nine on the ribs, and one on the femur.[2]  Dr. Adeyinka Adebayo, the treating doctor, testified that M.M. also had a severe diaper rash indicating possible neglect.

At trial, Dr. Adebayo testified that M.M.'s condition was "highly suggestive of a nonaccidental trauma."  Dr. Adebayo elaborated that the skull fracture could have been caused by M.M. falling to the ground from a height between three and five feet or by someone "bang[ing] [the child's] head against something";  the femur fracture could have been caused by "pulling" or "twisting" M.M.'s leg, though the amount of force had to be "significant" because femur bones almost never fracture; and the rib fractures could have been caused by "squeezing" or "compressing" M.M.'s chest area, though a "lot of force"

---

[1] We use initials throughout this memorandum opinion to protect the child's identity.  *See generally* TEX. R. APP. P. 9.8.

[2] The femur or thigh bone is found in the upper leg of the human body.

2

had to be applied. Dr. Adebayo testified that M.M. showed none of the symptoms associated with osteogenesis imperfecta—a genetic disorder that causes brittle bones.

Dr. Adebayo testified that the fractures were at various stages of healing. He elaborated that the rib fractures were at least one month old based on cartilage formation, but some rib fractures were older than others—indicating that the ribs were probably not fractured at the same time; the femur fracture was "relatively new"; and the skull fracture was the "most recent."

The day after M.M. was admitted to the hospital, a police investigator interviewed Medrano about M.M.'s injuries. In a written statement, Medrano admitted that, two days earlier, M.M. accidentally fell off the bed while he turned to grab a diaper. Medrano and Garza's bed measured approximately two feet off the ground. Medrano elaborated:

> [M.M.] was in her crib, I was on the bed and [Garza] was in the kitchen making dinner. [M.M.] started to cry and I noticed she was wet (soiled pamper) so I picked her up and placed her on the bed, towards the foot of the bed. I was sitting on the edge of the bed and when I turned to my right to reach for the pampers, [M.M.] fell off the bed. I turned immediately and I saw [M.M.] fall to the wooden floor. I know there was a pillow on the floor which her body landed on. [M.M.] was crying but cried only for about a minute but I calmed her down.

Medrano also admitted that he did not tell Garza about the incident until Dr. Adebayo informed them that M.M.'s skull had been fractured. Medrano stated that he kept the information about the fall from Garza because he "didn't think it was serious."

During the police interview, Medrano learned for the first time that M.M. also sustained rib fractures that were "old." To explain these fractures, Medrano described an incident that happened approximately one month before the more recent diaper-changing incident. Medrano elaborated that he and Garza engaged in a physical tug-of-war over possession of M.M., during which he admitted that he "pulled" M.M. while Garza clung

3

"tight[ly]" to the child. Medrano did not specify in his statement which part of M.M.'s body he pulled.

Garza spoke to a CPS investigator and a police investigator at the hospital regarding M.M.'s injuries. At trial, the CPS investigator testified that Garza said Medrano pulled M.M.'s leg during the tug-of-war and that M.M. cried. Medrano's counsel did not object to this testimony on hearsay or other grounds. Unexpectedly, the police investigator testified that, after Medrano's trial, he intended to arrest Garza for her part in this case.[3] This revelation prompted the learned trial judge to inform Garza, outside the presence of the jury, that she had become a criminal suspect and that she did not have to testify at Medrano's trial.

The State called Garza as its last witness. Heeding the trial judge's admonishment, Garza refused to testify. The State rested.

## C. Medrano's Rebuttal Evidence

After the State rested, Medrano testified in his defense. Based on his testimony on direct and cross examination, Medrano's defense was that: (1) M.M.'s skull probably fractured at some point before the diaper-changing incident; (2) M.M.'s ribs probably fractured during the tug-of-war incident, but it was Garza who "squeezed" M.M.'s rib cage, so she is to blame for any ribs that may have fractured during that incident; and (3) M.M.'s femur probably did not fracture during the tug-of-war incident because he pulled M.M. from her arms (or underarms), but not from her legs.

---

[3] The investigator provided no cogent explanation for why he waited so long (one year, four months) to decide to arrest Garza—other than to say the investigation was still pending and the ten-year statute of limitation had not yet expired.

4

On cross examination, the prosecutor attempted to cast doubt on Medrano's assertions with respect to each incident. Regarding the diaper-changing incident, the prosecutor asked Medrano if he was sure M.M. fell from the bed—which stood two feet from the ground—considering Dr. Adebayo's testimony that the fracture was likely caused by a three-to-five foot drop or by someone "bang[ing] [the child's] head against something." Medrano responded that he did not know whether M.M.'s skull fractured at that time and could only say that M.M. accidentally fell off the bed while under his care.[4] Regarding the tug-of-war incident, Medrano denied that he pulled on M.M.'s legs or rib cage, maintaining only that he pulled under (or around) M.M.'s arms.

## D.   The Jury Charge and Verdict

After both sides closed, the charge was submitted to the jury. The application portion of the charge asked the jury to consider whether the Medrano committed at least one of the following offenses in descending order:

1. injury to a child by intentional or knowing conduct, as alleged in the indictment;[5]

2. injury to a child by reckless conduct;[6] or

3. injury to a child by criminally negligent conduct.[7]

---

[4] The prosecutor then countered by intimating that Medrano may be hiding conduct more sinister in nature because the fall had to be from at least three feet, according to Dr. Adebayo. The prosecutor suggested that Medrano may have concocted the diaper-changing incident, highlighting Medrano's one-time use of the word "dropped" rather than "fell" while testifying about the incident, which the prosecutor suggested was more than an innocent slip-of-the-tongue. In response to this line of questioning, Medrano clarified: "I dropped her because I left her on the bed. . . . I'm sorry. I dropped out of school. I don't know how to speak much English."

[5] A first-degree felony. *See* TEX. PENAL CODE ANN. § 22.04(e) (West, Westlaw through 2017 1st C.S.).

[6] A second-degree felony. *See id.*

[7] A state-jail felony. *See id.* § 22.04(g).

5

The application portions of the charge grafted the "serious-bodily-injury-by-manner-means-unknown" language in the indictment, substituting only the applicable culpable mental state for each offense. Consequently, the application portion did not specify which conduct provided the basis for Medrano's guilt—i.e., the month-old tug-of-war incident or the two-day-old diaper-changing incident—and the application portion did not specify which injuries resulted from those incidents—i.e., the skull fracture, the femur fracture, and/or the rib fractures. Nevertheless, the charge contained a general boilerplate unanimity instruction, stating:

> Your verdict must be unanimous, and after you have reached a unanimous verdict, the Presiding Juror will certify thereto by signing the appropriate [verdict] form attached to this charge.

Although the charge included this boilerplate language, it did not instruct the jury that, should it decide to convict Medrano under any grade of injury to a child, it had to be unanimous as to the incident and injury for which Medrano would be held criminally responsible. This instruction is known as an incident-specific unanimity instruction. *See Cosio v. State*, 353 S.W.3d 766, 776 (Tex. Crim. App. 2011) (observing that, depending on the State's evidence, it is sometimes appropriate to instruct the jury that it must unanimously agree on one incident of criminal conduct (or unit of prosecution) that meets all of the essential elements of the single charged offense beyond a reasonable doubt).

Attached to the jury charge was a verdict form, which provided the following four options in descending order:

1. GUILTY of injury to a child by intentional or knowing conduct;

2. GUILTY of injury to a child by reckless conduct;

3. GUILTY of injury to a child by criminally negligent conduct; or

6

4.  NOT GUILTY

The jury retired to deliberate with the charge in hand.  Sometime thereafter, the jury sent a note.  The trial court described the contents of the note in open court, but the note itself is not included in the clerk's or reporter's record.  The trial court stated:  "I have a note that came in at 10:05 from the Presiding Juror. . . . [The question] is do we have to have a unanimous or majority decision?  That's an easy one, unanimous."  There is no indication that an incident-specific instruction was given or explained to the jury at that time.

After deliberating for a period, the jury found Medrano guilty of injury to a child by criminally negligent conduct, and the trial court sentenced him to two years in a state-jail facility.  This appeal followed.

## II.  JURY CHARGE

By his first issue, Medrano contends that the general boilerplate unanimity instruction was not sufficient to inform the jury that its verdict had to be unanimous.  According to Medrano, the general instruction was not sufficient in this case because the State charged one count of injury to a child and presented evidence that the charged offense occurred on multiple but separate occasions, necessitating an incident-specific unanimity instruction.

We review an allegation of jury-charge error in two steps:  first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal.  *See Arteaga v. State*, 521 S.W.3d 329, 333 (Tex. Crim. App. 2017).

### A.    Step One:  Did Error Occur?

7

The State candidly concedes that the jury charge erroneously omitted an incident-specific unanimity instruction. We agree with the State.

The Texas Constitution requires that a jury verdict in a felony case be unanimous. *See* TEX. CONST. art. V, § 13. As applicable here, "non-unanimity may occur when the State charges one offense and presents evidence that the defendant committed the charged offense on multiple but separate occasions." *Ansari v. State*, 511 S.W.3d 262, 265 (Tex. App.—San Antonio 2015, no pet.) (quoting *Cosio*, 353 S.W.3d at 772). In such a case, "it is the trial court's responsibility to ensure unanimity by instructing the jury in the charge that its verdict must be unanimous as to a single incident of the offense among those presented by the State." *Id.; see Cosio*, 353 S.W.3d at 773–74 (concluding that the jury charge erroneously omitted an incident-specific unanimity instruction because, based on the State's evidence, the jury could have relied on separate incidents of criminal conduct, which constituted different offenses or separate units of prosecution, to find the defendant guilty). Injury to a child is a result-oriented offense, meaning the essential element or focus of the offense "is the result of the defendant's conduct (in this case, serious bodily injury to a child)." S*ee Villanueva v. State*, 227 S.W.3d 744, 748 (Tex. Crim. App. 2007). Thus, the injury itself forms the gravamen of the offense or allowable unit of prosecution. *Id.*

In view of the evidence presented, the State's alternate theories of guilt, and the vague "serious-bodily-injury-by-manner-means-unknown" language used in application portions of the charge, we agree with the State that a potential danger exists in this case that the jury convicted Medrano without necessarily agreeing unanimously on which incident—i.e., the month-old tug-of-war incident or the two-day-old diaper-changing

8

incident—caused which of the various fractures found on M.M.'s body. Without an incident-specific unanimity instruction, it is conceivable that some jurors may have premised a finding of guilt on fractures to M.M.'s femur or the child's ribs, which arguably correlate with Medrano's conduct during (and the timing of) the tug-of-war incident, while other jurors may have convicted based on the skull fracture, which arguably correlates with Medrano's conduct during (and the timing of) the more recent diaper-changing incident. It is undisputed that these incidents were separated in time and that each, standing alone, could support a conviction for injury to a child if proven beyond a reasonable doubt.[8]

Because the State charged one count of injury to a child but presented evidence indicating that the offense may have occurred on separate occasions, the trial court was required to include an incident-specific unanimity instruction to ensure that all twelve jurors agreed upon a single and discrete incident that would constitute the commission of the offense alleged. *See Cosio*, 353 S.W.3d at 773–74. Therefore, we find error. *See id.*

**B.      Step Two:  Was the Error Harmful?**

Having found error, we now ask whether sufficient harm resulted from the error to require reversal. *See Arteaga*, 521 S.W.3d at 333. At the jury-charge conference, Medrano did not object to the charge on the basis that it omitted an incident-specific

---

[8] The State does not argue that the injuries were so inextricably intertwined in terms of time and type as to constitute only one injury for purposes of determining the number of units of prosecution presented to the jury. *Johnson v. State*, 364 S.W.3d 292, 296 (Tex. Crim. App. 2012) (observing that courts are frequently called upon to determine the "allowable unit of prosecution" in cases involving jury-unanimity jurisprudence).

unanimity instruction. This impacts our harm analysis because defendants who do not object to charge error must be "egregiously" harmed by the error to obtain a new trial. *See Cosio*, 353 S.W.3d at 777. Egregious harm must be based on a finding of actual rather than theoretical harm. *Id.* For actual harm to be established, the charge error must have affected "the very basis of the case," "deprive[d] the defendant of a valuable right," or "vitally affect[ed] a defensive theory." *Id.* (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)). When assessing harm based on the particular facts of the case, we consider: "(1) the [jury] charge; (2) "the state of the evidence[,] including contested issues and the weight of the probative evidence"; (3) the parties' arguments; and (4) all other relevant information in the record." *Id.* (quoting *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).

## 1. The Jury Charge

As explained above, the jury charge did not eliminate the danger of a non-unanimous verdict. Although the charge contained a boilerplate unanimity instruction, it is well-settled that such an instruction does not rectify the type of error involved here. *See id.* at 774 (concluding that boilerplate unanimity instruction did not rectify the error in failing to include an incident-specific unanimity instruction when such instruction was required based on the evidence). Therefore, "[n]othing in the charge[] [itself] militates against [the conclusion that the charge permitted a non-unanimous verdict.]" *Id.* at 777.

## 2. State of the Evidence

We next consider whether and to what extent contested issues in the case interacted with the charge error.

10

Here, the dispute concerned who did what to M.M. and when. The State pointed to the fact that Medrano admitted to both the tug-of-war incident and the diaper-change incident, arguing M.M. sustained at least one of thirteen fractures because of one or both incidents.[9] Medrano responded that his conduct during the two incidents was not sufficient to cause any of the thirteen fractures, and that, if Garza had nothing to hide, she would have testified at trial like he did. Thus, Medrano's defense was that the jury had enough reason to doubt that he was guilty of *any* criminal offense.

As the State aptly points out, the jury apparently was not persuaded by Medrano's all-or-nothing defense because, if it was, the logical verdict would have been to acquit in whole rather than to convict on a lesser offense, as happened here. *See id.* (finding no egregious harm where, among other things, the jury's implicit rejection of the defendant's all-or-nothing defense made it "highly likely" that its verdict was unanimous as to each count). As in *Cosio*, we believe the likelihood of a unanimous verdict in this case was sufficiently high based on the state of the evidence and the contested issues. *See id.*

Finally, we find it significant that Medrano does not urge on appeal that the evidence was legally insufficient to prove one of the two theories advanced by the State to support a conviction. This is important because the Texas Court of Criminal Appeals found egregious harm where one of two theories on which the State sought a conviction lacked sufficient evidence, thus creating an impermissible risk that some jurors convicted based on the invalid theory. *See Stuhler v. State*, 218 S.W.3d 706 (Tex. Crim. App. 2007).

---

[9] Regarding the culpable mental state, the State argued that Medrano was at least reckless in causing the injuries, but he probably intended the result as evidence by the severity of some of the fractures.

11

That issue, however, is not before us. *See* TEX. R. APP. P. 47.1. We conclude this factor weighs against a finding of egregious harm.

**3.  Arguments of the Parties**

We next consider whether and to what extent the arguments of the parties exacerbated the charge error. Here, the prosecutor in closing argument toggled between the two incidents and the injuries in making the case for injury to a child, but he never actually told jurors they could be non-unanimous with respect to the incident/injury and still convict. This aspect of the prosecutor's argument does not support a finding of egregious harm. *See Cosio*, 353 S.W.3d at 777 (holding that omission of unanimity instruction did not cause egregious harm where, among other things, the parties did not add to the charge error by telling the jury that it did not have to be unanimous about the specific instance of criminal conduct in rendering its verdict). Having said that, we cannot ignore the following statements the prosecutor made during closing, which treaded the line:

> [Y]ou are to consider all the injuries that went into play. The law provides that you only have to find that one of the serious bodily injuries were caused by [Medrano]. We have 13 fractures all of which are serious bodily injuries.
>
> . . .
>
> Now let's go through each of the injury types we have here. First the ribs, okay. Now, we're not asking you to find that he is more or less guilty than [Garza] at least for that one circumstance when they were tugging at the baby because if he is guilty of breaking at least one rib, he is still guilty. It doesn't matter if he had help or not. Guilty is guilty. If he thought he broke one of the ribs, he is guilty. If he thought he broke the skull, he is guilty. If he thought he broke her leg, he is still guilty.
>
> . . .
>
> Thirteen fractures—if you believe he caused even one, he is guilty.

12

As we understand these statements, the prosecutor emphasized that the evidence provided jurors thirteen different options on which to find the predicate serious bodily injury to support a conviction.[10] Although it is theoretically possible that jurors understood they need only agree that Medrano caused *a* fracture without agreeing on *which* fracture, we do not believe the jury construed the prosecutor's statements in that way; notably, the prosecutor never told jurors they could mix and match the incidents and injuries in arriving at their verdict. In this sense, we believe the statements are distinguishable from other statements made by prosecutors where courts have found egregious harm meriting reversal. *See Ngo v. State*, 175 S.W.3d 738, 752 (Tex. Crim. App. 2005) (holding that omission of unanimity instruction caused egregious harm where, among other things, the prosecutor misadvised jurors that they could mix and match three different acts even though, under the law, each act constituted a separate unit of prosecution of credit card abuse requiring unanimity); *Gomez v. State*, 498 S.W.3d 691, 698 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (finding egregious harm where, among other things, the prosecutor's closing encouraged a non-unanimous verdict by stating: "If four of you think that oil incident is beyond a reasonable doubt and four of you think that bed incident is beyond a reasonable doubt and the other four think that some other incident was beyond a reasonable doubt, then we have proved our case"); *Clear v. State*, 76 S.W.3d 622, 624

---

[10] Though not entirely clear, the prosecutor appeared to make the argument that the jury could base a verdict on the diaper rash too, stating:

> And as far as the diaper rash is concerned, it's on both of them. Both parents need to take care of the baby. If he is changing the diaper ever so often, he's going to notice this and it's an ongoing issue. So, like I said, don't be [misled]. They're both responsible. We're not asking for you to figure out who is more or less responsible. We're asking you to find out if he is responsible at all.

(Tex. App.—Corpus Christi 2002, no pet.) (finding egregious harm where, among other things, the prosecutor misadvised the jurors that: "As long as we have proven to each and every one of you at least one of these manners, we are entitled to a guilty verdict. You don't all have to agree on which manner we've proven it to you, as long [as] we've proven one of these. So we only have to convince you of one, but there's three different ways that you can find this man guilty, Okay?"). Because the prosecutor here did not go as far as the prosecutors in the above cases, we believe this factor weighs slightly against a finding of egregious harm.[11]

## 4.    Other Relevant Information

Finally, we consider any other relevant information in the record. In making the argument for egregious harm, Medrano directs our attention to the jury's mid-deliberation note, where the jury inquired whether its decision had to be "unanimous or majority," and the trial court answered "unanimous."

According to our research, courts have considered the existence (and content) of jury notes in determining whether the erroneous omission of an incident-specific unanimity instruction caused actual rather than theoretical harm. *Compare Smith v. State*, 515 S.W.3d 423, 431 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (finding no egregious harm where, among other things, "[t]he record reveal[ed] no jury notes or any other indication that the jury sought any clarification regarding unanimity"), *with Gonzales v. State*, No. 03-16-00541-CR, 2017 WL 6756812, at *10 (Tex. App.—Austin Dec. 21, 2017, pet. filed) (mem. op., not designated for publication) (finding egregious harm where, among other things, the record indicated that, although the jury's note expressed "serious"

---

[11] During closing, Medrano's counsel did not reference the unanimity issue.

14

confusion regarding unanimity, the trial court's response merely referred the jury back to the boilerplate unanimity instruction, which did not adequately instruct the jury on unanimity).

Here, the jury sent a note inquiring about unanimity. Considering that the trial judge had already provided a boilerplate unanimity instruction, it is somewhat concerning that the jury found it necessary to seek further clarification regarding unanimity. However, nothing the trial court described in the note indicates that the jury was confused regarding whether unanimity was required as to a specific incident or injury. Given the content of the note, we believe it would be speculative to assume that it evidenced the jury's confusion in that regard. Consequently, we do not believe the note itself provides competent proof of actual (as opposed to theoretical) harm. *See Cosio*, 353 S.W.3d at 777; *see also Gomez*, 498 S.W.3d at 699 (rejecting appellant's argument that jury note sought clarification on the unanimity issue when a review of its content showed that the jury sought clarification on a different issue—namely, whether the date in the indictment was a necessary element of the charge). Furthermore, even if we were to assume that the note evidenced the jury's confusion regarding whether unanimity was required as to a specific incident or injury, we are confident that the trial court's answer to that inquiry was adequate to clarify any confusion when the trial court stated "unanimous."

5.    **Summary**

When examining all four factors to determine egregious harm, we believe only the first factor supports reversal—because nothing in the jury charge itself alleviated the danger of a non-unanimous verdict; the other three factors do not. The state of the evidence (second factor) is against reversal—because Medrano pursued an all-or-

15

nothing defense, making it highly likely that the jury's verdict was unanimous. The arguments of the parties (third factor) is slightly against reversal—because the prosecutor did not overtly misstate the law regarding unanimity, as did the prosecutors in *Ngo*, *Gomez*, and *Clear*, which resulted in reversals. Finally, we are not persuaded that the jury note (fourth factor) evidences actual rather than theoretical harm. Although this is a close call, we conclude that actual harm has not been shown, and therefore, we cannot say that Medrano was denied a fair and impartial trial. We overrule Medrano's first issue.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

By his second issue, Medrano contends his trial counsel made errors before and during trial which prejudiced his defense.

### A. Standard of Review

*Strickland v. Washington* sets forth a two-prong test for reviewing a claim of ineffective assistance of counsel. *See* 466 U.S. 668, 687 (1984). Under *Strickland*'s first prong, a defendant must demonstrate that his counsel's performance was deficient in that it fell below an objective standard of reasonableness. *See id.* To make this showing, the defendant must identify the "acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The reviewing court must then determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*

Generally, if the record is silent as to why trial counsel engaged in the action being challenged as ineffective, there is a "strong presumption" that counsel's conduct was the result of sound trial strategy, falling within the wide range of reasonable professional assistance. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Ingham*

16

*v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984)). To overcome this presumption, a claim of ineffective assistance must be firmly demonstrated in the record. *Id.* at 814. Direct appeal is usually an inadequate vehicle for raising an ineffective-assistance claim because the record is frequently undeveloped. *See Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012). Counsel usually must be afforded an opportunity to explain his challenged actions before a court concludes that his performance was deficient. *Id.* at 593. If trial counsel has not had such an opportunity, we will not find deficient performance unless the conduct "was so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

Under *Strickland*'s second prong, the defendant must demonstrate that counsel's deficient performance was so serious that it deprived him of a fair trial—i.e., a trial with a reliable result. *See* 466 U.S. at 687. To demonstrate prejudice, the defendant must show that but for his trial counsel's deficient performance, there is a "reasonable probability" that the outcome of the trial would have been different. *Id.* at 694. A "reasonable probability" in this context refers to a "probability sufficient to undermine confidence in the outcome." *Id.*

**B.     Analysis**

By four allegations, which we construe as two, Medrano contends that his trial counsel was ineffective: (1) by failing to require the State to allege in the indictment, or elect at the end of its case-in-chief, the specific incident and injury on which the State sought to base a conviction; and (2) by failing to object to the CPS investigator's testimony regarding what Garza said at the hospital. We address each below.

17

**1.    Failing to Require the State to Allege or Elect a Specific Incident and Injury**

Medrano's ineffective assistance claim fails at *Strickland*'s first prong—i.e., the performance prong.  Because the record is silent regarding the reason for trial counsel's decision, we must presume that counsel's failure to require the State to allege or elect a specific incident and injury was strategic.  *See Thompson*, 9 S.W.3d at 813; *Goodspeed*, 187 S.W.3d at 392.  This presumption can be overcome only if trial counsel's decision was so outrageous that no competent attorney would have made it.  In *Cosio*, the Texas Court of Criminal Appeals observed that a defendant may be guided by trial strategy in not requiring the State to elect a specific act on which to base a conviction.  353 S.W.3d at 775.  The Court explained that "[a] defendant may choose not to elect so that the State is jeopardy-barred from prosecuting on any of the offenses that were in evidence."  *Id*.  We do not know whether trial counsel forewent an election to yield a favorable double-jeopardy consequence in this case.  For our purposes here, it matters only that the decision may have been strategic, which means it could not fall within the category of decision-making that we would consider so outrageous that no competent attorney would have made it.[12]  *See Goodspeed*, 187 S.W.3d at 392.  Accordingly, we conclude that Medrano failed to satisfy *Strickland*'s deficient-performance prong with respect to his first allegation of ineffectiveness.

**2.    Failing to Object to CPS Investigator's Testimony**

---

[12] We note that the defendant's decision to forgo election does not absolve the trial court of the responsibility to instruct the jury on the law applicable to the case.  *See Cosio v. State*, 353 S.W.3d 766, 776 (Tex. Crim. App. 2011).  Thus, even when a defendant forgoes an election, the trial judge must submit a charge that does not allow for the possibility of a non-unanimous verdict.  *See id*.  For this reason, defendants like Medrano may raise ineffective assistance claims stemming from the failure to elect while also alleging jury-charge error regarding unanimity.  *See id*.

Medrano contends that his counsel was ineffective in failing to object to the investigator's testimony regarding what Garza said at the hospital. As previously noted, the investigator testified that Garza said that Medrano was a co-participant in the tug-of-war incident and that he pulled M.M.'s legs. Garza. Medrano argues trial counsel should have objected because the investigator's testimony was hearsay and violated his constitutional right to confront and cross examine Garza because she refused to testify.

Again, Medrano's ineffective assistance claim fails at *Strickland*'s first prong. The record is silent regarding trial counsel's failure to object, and Medrano has not shown that counsel's omission was so outrageous that no competent attorney in trial counsel's shoes would have done the same. *See id.* Additionally, as the State aptly points out, trial counsel may have decided not to object to the complained-of testimony because counsel expected to cross examine Garza later in the trial regarding what she told the investigator. However, in an unexpected twist, the investigator revealed on the witness stand that Garza would be arrested following Medrano's trial, which prompted Garza to assert her Fifth Amendment right against self-incrimination. Given the sequence of the complained-of testimony, the surprise testimony regarding Garza's impending arrest, and Garza's belated refusal to testify, we cannot say that trial counsel had any way of knowing, at the time of the companied-of testimony, that this unexpected twist would later unfold and prevent Medrano from cross examining Garza. We decline to find deficient performance based on trial counsel's failure to predict the future. We overrule Medrano's second issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

19

**/s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed this
28th day of June, 2018.