

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00500-CR
No. 02-18-00501-CR

_____

BOBBY LYNN RACHAL, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court Nos. 1567358R, 1525613D

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Based on two separate indictments, a jury convicted Appellant Bobby Lynn Rachal of six out of seven different charges ranging from assault with a deadly weapon (a vehicle) to continuous violence against a family member. In four of the charges, the State sought to increase the punishment range by alleging that Rachal had a prior family-violence conviction from Louisiana in 2016. In both indictments, the State also sought habitual-offender and deadly-weapon findings.

In seven issues spanning two briefs, Rachal argues that there is insufficient evidence to support that he had previously been convicted of family violence in Louisiana, that some of his convictions are barred by double jeopardy, and that the trial court erroneously made deadly-weapon findings on three of his convictions. Because we agree that one of Rachal's charges is barred by double jeopardy, we will vacate the judgment related to that conviction. Because we also agree that two of Rachal's judgments impermissibly contain a deadly-weapon finding, we will delete the deadly-weapon finding in those judgments and affirm them as modified. Finally, because we overrule Rachal's complaints regarding the State's use of the Louisiana conviction, we will affirm the remaining judgments.

## II. BACKGROUND[1]

Summer Cerna was driving home on the afternoon of September 22, 2017, when she passed an RV park and witnessed a woman walking fast and looking over her shoulder in fear. Cerna then saw a man in a maroon truck driving toward the woman "really fast" in an apparent attempt to strike the woman with the truck. The woman, later identified as Leah Gooden, was able to avoid being struck by running between a car and a building. The man, later identified as Rachal, then exited the truck. Concerned for Gooden, Cerna turned her vehicle around and stopped at the RV park. Upon arriving, Cerna saw Rachal dragging Gooden by her throat back toward the maroon truck—Gooden was screaming and yelling as he dragged her. By Cerna's account, Gooden appeared to be in fear for her life. Because multiple people came over to see what was going on, Rachal got back into the truck and drove away without Gooden. Cerna then called 911. In the 911 call, Cerna described that Rachal appeared high on drugs and that Gooden had red marks on her face, neck, and legs.

After the police arrived on scene, Cerna left the RV park with the intention of driving home but then saw Rachal driving the maroon truck in the area. Cerna called 911 a second time and followed Rachal until police apprehended him.

---

[1]Because Rachal does not challenge the sufficiency of the evidence to support the elements of the underlying offenses to each of his convictions, we will only address the facts of the case briefly in order to provide context.

At trial, Gooden testified that she had begun dating Rachal during the spring of 2017, and they were almost always together. Gooden described Rachal as "very controlling," and she testified that she feared Rachal because he had told her he was a founding member of a white supremacist group and that if she ever associated outside of her race she would end up in a trunk somewhere, "duct-taped up."

According to Gooden, the pair often used methamphetamine but had agreed to quit once they moved to Texas in August 2017. Gooden testified that once they had arrived in Texas, Rachal and his brother had gotten "high." Gooden said that when Rachal was high on methamphetamine he would act bizarrely, including accusing her of wanting to have sex with non-white men.

Gooden averred that on September 22, 2017, she and Rachal had gone to his brother's camper at the RV park. Gooden said that she had fallen asleep for most of the day and that when she woke, Rachal was already high and "set off," accusing her of having sex with a handyman as Rachal attempted to smoke methamphetamine from his brother's pipe. By Gooden's account, she and Rachal then had gotten into an argument, and she declared that she could not handle being with Rachal anymore. Gooden said that she then had grabbed her purse, left the camper, and headed toward the RV park's front office. Gooden stated that as she had walked, she could hear Rachal yelling at her to return.

Gooden said that because no one had answered her knock at the office, she had begun to walk quickly toward the highway when she heard tires "peeling out

4

behind" her. According to Gooden, at one point she had turned around and feared for her life because of how fast and aggressively Rachal had driven toward her. Gooden said that fortunately there was a vehicle that she had hidden behind and that she thought, "that's probably today the only reason why [she was] still standing here [alive]."

Gooden said that as she continued to flee, she had knocked on a nearby door and begged to be let inside to no avail. At this time, according to Gooden, Rachal had then pulled up and demanded that she get into the truck. Gooden said that she had refused, so Rachal exited the truck, grabbed her by her throat, and slammed her against a nearby building. Gooden said that as Rachal held her throat, he had begun to constrict his hands to the point where she could no longer breathe and that she had started to see white spots. From there, Gooden said that Rachal had attempted to drag her into the truck but that once he had seen others gathering around, Rachal had gotten into the truck and sped away. According to Gooden, the struggle resulted in her having red marks all over her body. After the police arrived at the RV park, police officers assisted Gooden in getting a protective order in place but that did not keep the couple apart for long.

Gooden recalled how in late November 2017, she had bailed Rachal out of jail after he had promised to go to treatment for his addiction. After spending the night in a hotel with Rachal, Gooden said that she had decided again to break off their relationship and that she had returned to the RV park because she believed that she

5

was safe there due to the protective order. Gooden said that despite the protective order, Rachal had begun to call her numerous times each day and that she had begun to take him hot meals because he was sleeping in the truck.

According to Gooden, in the evening on December 11, 2017, she had been outside attempting to fix her trailer, and Rachal had shown up. Gooden said that Rachal had gone inside her trailer and declared that he was home and that there was nothing Gooden could do about it. Gooden said that the couple had gotten into an argument and that she had begun to scream as loud as possible in hopes that her neighbors would call the police. Gooden said that by the time police had arrived, Rachal had already punched her in the face and grabbed her throat "for a quick minute." By Gooden's admission, she could not breathe normally during that minute.

Ultimately, a jury found Rachal guilty of all four counts found in Indictment A. Those counts included:

- Count A1: Aggravated assault with a deadly weapon, a motor vehicle, related to the September 22 incident.

- Count A2: Assault while impeding the breath of a family member with a prior domestic-assault conviction related to the September 22 incident.

- Count A3: Assault on a family member with a prior domestic-assault conviction related to the September 22 incident.

- Count A4: Continuous violence against a family member predicated on the September 22 and December 11 incidents.

6

The trial court entered separate judgments for all four of these counts and each of the judgments for Count A1 through Count A4 contain a deadly-weapon finding.

The jury also found Rachal guilty of two of the three counts from Indictment B. Those counts included:

- Count B1: Assault while impeding the breath of a family member with a prior domestic-assault conviction related to the December 11 incident.

- Count B2: Assault on a family member with a prior domestic-assault conviction related to the December 11 incident.

Again, the trial court entered separate judgments for Counts B1 and B2. After holding a punishment hearing, the trial judge sentenced Rachal to sixty years' incarceration for each of the six convictions, ordering that the sentences run concurrently. The trial court did not impose any fines or restitution. After the trial court rendered judgments accordingly, this appeal followed.

## III. DISCUSSION

### A. Rachal's Previous Louisiana Conviction

In four of his issues, Rachal argues that the evidence is insufficient to support that he had previously been convicted "of a family violence offense under Louisiana law containing elements substantially similar under Texas assault law" and that this court should render a judgment of acquittal for Count A2, Count A3, Count B1, and Count B2. We disagree.

Under the Texas Penal Code, a prior conviction for a family-violence-assault offense committed in another state can be used as an enhancement if it is shown to have elements that are "substantially similar" to the elements required for a family violence assault conviction in Texas. Tex. Penal Code Ann. § 22.01(f)(2). In this case, prior to trial, the State argued (and the trial court agreed over Rachal's objection) that Rachal's 2016 Louisiana conviction for domestic abuse battery was substantially similar to the Texas assault offenses with which the State had charged Rachal.

The legislature did not define the phrase "substantially similar," but in *Prudholm v. State*, 333 S.W.3d 590 (Tex. Crim. App. 2011), and then again in *Anderson v. State*, 394 S.W.3d 531 (Tex. Crim. App. 2013), the Texas Court of Criminal Appeals applied a two-pronged test for deciding whether the elements of two offenses were substantially similar. The first prong of that test requires a court to compare the elements of the two offenses and determine whether they "display a high degree of likeness." *Prudholm*, 333 S.W.3d at 594; *Anderson*, 394 S.W.3d at 535. The second prong requires a court to consider whether the elements are "substantially similar with respect to the individual or public interests protected and the impact of the elements on the seriousness of the offenses." *Prudholm*, 333 S.W.3d at 595; *Anderson*, 394 S.W.3d at 536.

Rachal addresses this two-pronged test in both of his appellate briefs, and he primarily focuses his arguments on the second prong. But as the State correctly points out, the Texas Court of Criminal Appeals recently overruled *Prudholm* and

8

*Anderson* "to the extent that they imposed the second prong of their test for substantial similarity." *See Fisk v. State*, 574 S.W.3d 917, 925 (Tex. Crim. App. 2019). The Court explained that the second prong was "unworkable and unnecessary," and that the only relevant inquiry was the first prong. *Id.* We accordingly limit our analysis to the first prong and do not consider Rachal's arguments under the second prong. Because the first prong presents a pure question of law, our review is de novo. *See Anderson*, 394 S.W.3d at 534.

### 1. The Louisiana Offense

Under the Louisiana statute, domestic abuse battery is defined as "the intentional use of force or violence committed by one household member or family member upon the person of another household member or family member." La. Rev. Stat. Ann. § 14:35.3(A). The Louisiana statute further defines a "household member" as "any person presently or formerly living in the same residence with the offender and who is involved or has been involved in a sexual or intimate relationship with the offender." *Id.* (B)(5). And the Louisiana statute defines "strangulation" as "intentionally impeding the normal breathing or circulation of the blood by applying pressure on the throat or neck or by blocking the nose or mouth of the victim." *Id.* (B)(7).

### 2. The Texas Offense

In Texas, a person commits assault if he "intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse." Tex. Penal Code

9

Ann. § 22.01(a)(1). Assault becomes domestic in nature when the assailant and the victim are in a "dating relationship," defined as "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature." Tex. Fam. Code Ann. § 71.0021. And the normally categorized Class-A-misdemeanor assault is elevated to a second-degree felony when the assailant and victim are in a dating relationship and "the offense is committed by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth." Tex. Penal Code Ann. § 22.01(b)(2)(B).

### 3.     Rachal's Louisiana Conviction

Before the beginning of trial, the State sought to introduce the indictment and plea-agreement paperwork showing that Rachal had been convicted of domestic abuse battery in Louisiana in 2016. Over Rachal's objection, the trial court permitted the State to introduce this evidence to support its charge that Rachal's convictions should be enhanced because of the prior conviction. These documents show that Rachal pleaded guilty to having "intentionally used force or violence upon a person of another household member . . . without the consent of said victim."

As mentioned, our review is isolated to the question of whether the Louisiana offense of which Rachal was convicted "display(s) a high degree of likeness" to the Texas offenses with which he was charged. *See Fisk*, 574 S.W.3d at 925; *Prudholm*, 333 S.W.3d at 594. It can hardly be argued that these statutes are not substantially

10

similar. Indeed, both statutes address the assault of another person. Both statutes begin with the *mens rea* of intention. *See Tex. Dep't of Pub. Safety v. Fowle*, 581 S.W.3d 417, 419 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (applying *Fisk* and comparing the elevated *mens rea* in both an Arizona statute and Texas statute in determining that the statutes were substantially similar). Both statutes increase the status of the offense when a dating partner is the victim. And both statutes have a heightened punishment for impeding the dating partner's breath. Here, the State presented evidence that Rachal had been convicted of domestic abuse battery and evidence that Rachal had physically assaulted Gooden on September 22, 2017, and again on December 11, 2017. Both of these Texas incidents involved multiple strikes from Rachal on Gooden, and both of these incidents involved Rachal having grabbed Gooden's throat, impeding her breath. We hold that the Louisiana statute under which Rachal was convicted in 2016 is substantially similar to the offenses that the State charged and convicted Rachal for and that the evidence supports Rachal's convictions for Count A2, Count A3, Count B1, and Count B2. *See Guild v. State*, No. 13-12-00175-CR, 2013 WL 4714560, at *5 (Tex. App.—Corpus Christi-Edinburg Aug. 30, 2013, no pet.) (mem. op., not designated for publication) ("[T]he State was able to use Guild's prior conviction for domestic abuse battery in Louisiana to prove a previous assault offense for purposes of establishing third-degree felony assault-family

violence."). We overrule Rachal's four issues related to his convictions for having a prior conviction of domestic abuse.[2]

## B.    Double Jeopardy and the Continuous Family Violence Conviction

In two of his issues, Rachal argues that his conviction for continuous violence against a family member in Count A4 and his conviction for assault while impeding the breath of a family member enhanced by Rachal's prior conviction in Count B2 are barred by double jeopardy. The State concedes that the same conduct which served as the basis for his convictions in Count A2, Count A3, Count B1, and Count B2 is the same conduct he has been convicted for in Count A4. The State argues, however, that if this court vacates Rachal's conviction in Count A4 then Rachal's argument that Count B2 is barred by double jeopardy is moot because Rachal's complaint about Count B2 is predicated on his conviction in Count A4. We agree with the State.[3]

---

[2]We note that Rachal did not appeal his conviction for assault with a deadly weapon which carried with it an imposed sentence of sixty years' incarceration. Because the trial court ordered that the sentences to all of Rachal's convictions are to run concurrently, no matter this court's determination regarding Rachal's issues, he is still subject to a sixty-year sentence.

[3]The State's confession of error in a criminal case is important and carries great weight, but it is not binding. *See Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002). We are required to independently examine the error confessed because the proper administration of the criminal law cannot be left merely to the stipulation of parties. *Id.*; *Gallegos v. State*, No. 08-14-00275-CR, 2015 WL 8334835, at *2 (Tex. App.—El Paso Dec. 9, 2015, no pet.) (not designated for publication).

12

## 1. The Law of Double Jeopardy

The double jeopardy clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see N. Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969). This guarantee is applicable to all states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 2062 (1969). The double jeopardy clause embodies three essential guarantees: (1) it protects against a successive prosecution for the same offense after acquittal; (2) it protects against a successive prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); *Evans v. State*, 299 S.W.3d 138, 140–41 (Tex. Crim. App. 2009).

As a general rule, the State is entitled to "one and only one, opportunity to require an accused to stand trial." *Ex parte Goodman*, 152 S.W.3d 67, 71 (Tex. Crim. App. 2004) (citing *Arizona v. Washington*, 434 U.S. 497, 505, 98 S. Ct. 824, 830 (1978)). The guarantee of not being twice placed in jeopardy serves "a constitutional policy of finality for the defendant's benefit." *Ex parte Herron*, 790 S.W.2d 623, 624 (Tex. Crim. App. 1990).

## 2. Preservation of Double Jeopardy Claim

Typically, even claims of double jeopardy are bound by rules of preservation, and an appellant must object in the trial court to preserve double jeopardy issues for

review. *Gonzalez v. State*, 8 S.W.3d 640, 642–46 (Tex. Crim. App. 2000). And in this case, Rachal did not object to the convictions he now challenges before the trial court on the grounds of double jeopardy. But because of the fundamental nature of double jeopardy protections, an appellant is excused from the preservation requirement when: (1) the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and (2) when enforcement of usual rules of procedural default serves no legitimate state interests. *Roy v. State*, 76 S.W.3d 87, 93 (Tex. App.— Houston [14th Dist.] 2002, no pet.) (citing *Gonzalez*, 8 S.W.3d at 643). An appellant must satisfy both prongs of the *Gonzalez* test in order to raise his complaint for the first time on appeal. *Id.*

With regard to the first prong, an appellant "has the burden of presenting the necessary record rather than meeting the burden of demonstrating from the face of the record already before the appellate court that an undisputed double jeopardy violation was involved." *Id.* at 94. We conclude that the first prong has been met in this case. Rachal was tried on all counts in this case before the same trial court and same jury, and the trial court knew or should have known of the potential jeopardy issue. *See id.* Further, Rachal has brought forth a complete developed record on appeal, and we can resolve his claims based on that record without the necessity of further evidentiary proceedings. *See id.* If a double jeopardy violation exists, we can determine it from the undisputed facts clearly apparent on the face of the record. *See id.*

We also conclude that the second prong has been met. If Rachal is successful on his double jeopardy claim, the appropriate remedy is to retain the conviction with the most serious punishment and vacate any remaining convictions that are the same for double jeopardy purposes. *Id.* (citing *Ball v. United States*, 470 U.S. 856, 864, 105 S. Ct. 1668, 1673 (1985), and *Landers v. State*, 957 S.W.2d 558, 559 (Tex. Crim. App. 1997)). A successful double jeopardy challenge will not require a retrial or remand to the trial court. *See id.* at 94–95. As a result, there are no legitimate state interests that would be negatively impacted by allowing Rachal to raise his double jeopardy claim for the first time on appeal. *See id.* Thus, we now consider the merits of Rachal's double jeopardy claims.

### 3. Rachal's Conviction in Count A4

Texas courts have addressed the issue of whether the Legislature intended multiple units of prosecution for an underlying offense for assault and continuous assaults based on that same conduct. For example, our sister court in Houston has addressed the issue and determined that "a double jeopardy violation results if the State attempts to punish [an] appellant for any underlying bodily-injury assault both under a separate assault count and as part of a continuous family violence count." *Ellison v. State*, 425 S.W.3d 637, 647 (Tex. App.—Houston [14th Dist.] 2014, no pet.). In reaching this holding, the *Ellison* court relied heavily on the Texas Court of Criminal Appeals' decision in *Soliz v. State* where the court analyzed the continuous-sexual-abuse-of-a-child statute and held that the statute only allowed one unit of

15

prosecution for the same conduct of the underlying assault or of continuous sexual abuse of a child, but not both. *Id.* (applying *Soliz v. State*, 353 S.W.3d 850, 851–53 (Tex. Crim. App. 2011)). We agree with the reasoning and analysis in *Ellison*, and we follow it here.

In this case, Rachal's conviction and punishment for continuous family violence in Count A4 clearly involved both the September 22 and December 11 instances of assaultive conduct toward Gooden. But those instances also served the basis for Rachal's convictions in Count A2, Count A3, Count B1, and Count B2. Thus, the same conduct alleged in Count A4 fell within the same allowable unit of prosecution found in Count A2, Count A3, Count B1, and Count B2. *See id.* The double jeopardy violation here stemmed from the impermissible overlap of two of the same underlying instances of bodily-injury assault against the same victim during the same time period. Therefore, the face of the record conclusively shows a double jeopardy violation. *See Roy*, 76 S.W.3d at 99. We therefore sustain Rachal's argument that his conviction in Count A4 is barred by double jeopardy.

"The remedy for impermissible multiple convictions and punishments is to retain the most serious offense and vacate the other, the more serious offense ordinarily being defined as the offense for which the greatest sentence was assessed." *Littrell v. State*, 271 S.W.3d 273, 279 n.34 (Tex. Crim. App. 2008). Here, the trial court assessed identical terms of punishment and no fines or restitution for each of Rachal's convictions—the offenses thus are equally "serious." *See Villanueva v. State*,

16

227 S.W.3d 744, 749 (Tex. Crim. App. 2007). But it was the offense for continuous violence against a family member that subjected Rachal to double jeopardy. *See Ellison*, 425 S.W.3d at 648. Accordingly, we vacate Rachal's conviction and sixty-year sentence for the offense of continuous violence against a family member in Count A4.

### 4. Rachal's Conviction in Count B2

Because we have held that Rachal's conviction under Count A4 should be vacated, Rachal's argument that Count B2 is barred by double jeopardy because his conviction under Count A4 was predicated on the same conduct is moot. *See id.* (affirming sentence and conviction for continuous violence against a family member after vacating sentence and conviction for separate continuous violence against a family member based on same incidents). We overrule Rachal's issue arguing that Count B2 is barred by double jeopardy.

## C. Deadly Weapon Findings

In his remaining issue, Rachal argues that the trial court erred by making a deadly-weapon finding in the judgments pertaining to Count A2, Count A3, and Count A4. The State agrees that these judgments should be modified to delete the deadly-weapon findings. We agree with the State, but we note that we need not address this issue as it pertains to Count A4 because we have held that the judgment in Count A4 should be vacated.

Courts do not look to the facts of a case to determine if an affirmative deadly-weapon finding is properly in a judgment; instead, we look to the charging instrument,

17

the jury charge, and the jury verdict to evaluate the propriety of a deadly-weapon finding in the judgment. *Polk v. State*, 693 S.W.2d 391, 396 (Tex. Crim. App. 1985). Here, the indictment's paragraphs containing Count A2 and Count A3 do not reflect that the State sought a deadly-weapon finding on those counts. Further, the jury charge did not ask the jury to make deadly-weapon findings on those counts, and the jury's verdicts on both of these counts do not reflect that the jury intended to make a deadly-weapon finding. Thus, we sustain Rachal's last issue, and we modify the judgments in Count A2 and Count A3 to delete the deadly-weapon findings. *See Duran v. State*, 492 S.W.3d 741, 750 (Tex. Crim. App. 2016) (modifying judgment to delete improperly entered deadly-weapon finding).

## IV. CONCLUSION

Having affirmed Rachal's convictions in Count A2 (assault while impeding the breath of a family member with a prior domestic-assault conviction) and Count A3 (assault on a family member with a prior domestic-assault conviction) but having modified the judgments in Count A2 and A3 to delete the deadly-weapon findings, we affirm those judgments as modified. Further, we affirm the trial court's judgments related to Count A1 (aggravated assault with a deadly weapon, a motor vehicle), Count B1 (assault while impeding the breath of a family member with a prior domestic-assault conviction), and Count B2 (assault on a family member with a prior domestic-assault conviction). Finally, we vacate the trial court's judgment related to Count A4 (continuous violence against a family member).

18

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 14, 2019

19