**Affirm in Part, Reverse and Render in Part; Opinion Filed May 11, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00092-CR

**SYED SARTAJ NAWAZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-81120-2017**

## MEMORANDUM OPINION
Before Justices Myers, Pedersen, III, and Garcia[1]
Opinion by Justice Pedersen, III

Appellant Syed Sartaj Nawaz pled not guilty to two counts of injury to a child.

The first count alleged that appellant caused serious bodily injury to a child pursuant

to section 22.04(a)(1) of the Texas Penal Code. The second count alleged that

appellant caused serious mental deficiency, impairment, and injury to a child

pursuant to section 22.04(a)(2) of the Texas Penal Code. Both counts alleged that

appellant's hands were used as a deadly weapon. A jury convicted appellant on both

---

[1] The Honorable Dennise Garcia succeeded the Honorable Bill Whitehill, a member of the original panel. Justice Garcia has reviewed the briefs and the record before the Court.

counts and answered "yes" to the special issue regarding a deadly weapon. The jury assessed his punishment, sentencing him to imprisonment for sixteen years on each count. The trial court ordered that the sentences be served consecutively.

Appellant raises seven issues for our consideration. He complains that his convictions violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. He asserts, alternatively, that the evidence is legally insufficient to sustain his conviction on the second count. He complains of various evidentiary rulings, jury charge error, and improper jury argument. He also urges that the special issue submitted to the jury lacked unanimity and should be vacated. We affirm the trial court's judgment in part; we reverse and render in part, vacating appellant's conviction on the second count for knowingly causing serious mental deficiency, impairment, and injury to a child.

## I. BACKGROUND

On September 19, 2016, appellant took his baby daughter, A.R., to her pediatrician, Dr. Gusterloh, for her two-month check-up. Dr. Gusterloh inquired why A.R. had spots of what appeared to be iodine on her face and head. Appellant explained that A.R. fell off a mattress the day before and bruised her forehead. Appellant and Natalie Rossi, his wife and A.R.'s mother, had applied iodine to the bruises because they thought it would be helpful. Dr. Gusterloh's nurse was able to remove most of the iodine. Other than the iodine on her face and a diaper rash, Dr.

Gusterloh testified that A.R. was a normal, healthy baby. Dr. Gusterloh gave A.R. a panel of five vaccines as part of her two-month check-up.

That evening, A.R. arrived at Children's Medical Center in Plano in critical condition. Her breathing was abnormal, her vital signs were abnormal, and her blood oxygen levels were abnormally low. The emergency room trauma team immediately began stabilization measures and attempted to assess what had caused A.R.'s condition. A.R. did not have any external injuries; however, a CT scan revealed multiple areas of bleeding in A.R.'s brain, specifically hematomas, intraparenchymal hematoma, and bleeding around the clivus—where the skull meets the spinal cord. The emergency room trauma team believed that the type of bleeding seen in A.R.'s CT scan was indicative of trauma—some sort of external force. They determined that A.R. should be transferred to Children's Medical Center in Dallas to be examined by a neurosurgeon.

Tamara Brown, a clinical social worker at Children's Medical Center in Plano, questioned appellant and Natalie about the child's injuries. At trial, Brown explained that it was her job to determine whether there was a plausible explanation for the child's injuries and to establish a timeline for everyone in contact with the child on the day the child was injured. Appellant and Natalie were not able to provide any explanation for A.R.'s injuries. They denied that A.R. fell or was dropped. After her conversation with appellant and Natalie, Brown called the Plano Police Department

and asked that an officer be dispatched to the hospital. She also called Child Protective Services.

When A.R. arrived at Children's Medical Center in Dallas around 1:00 a.m. on September 20, she was medically sedated and in critical condition. At trial, Dr. Michael Cooper, the emergency room pediatrician, described the tests performed on A.R. and the results of those tests. A CT scan of her cervical spine did not reveal any fractures but raised concerns about injury to the ligaments in her neck. A complete skeletal scan showed that A.R. had no broken or fractured bones on her body, including her skull. The medical team ultimately diagnosed injuries of subdural hematoma, epidural hemorrhage with loss of consciousness, intraparenchymal hemorrhage, acute respiratory failure, and hypothermia. Dr. Cooper testified that A.R.'s condition was not caused by stroke or seizure. It was his opinion that her injuries were caused by non-accidental abusive head trauma.

Dr. Kristen Reeder, a child abuse pediatrician with the REACH[2] team at Children's Medical Center, evaluated A.R. later that morning. She reviewed the medical records and test results, spoke to appellant and Natalie, and examined A.R. An MRI performed on September 21, 2016, showed several contusions, or bruises, on different places of A.R.'s brain, indicating that the brain had impacted the skull. The MRI also showed that A.R. had ligament damage and swelling in her neck,

---

[2] REACH is an acronym for Referral and Evaluation of At Risk Children.

indicating a whiplash-type motion in which A.R.'s head was swung back and forth causing extreme bending and stretching of her neck ligaments and muscles. Dr. Reeder ultimately concluded that A.R.'s injuries were the result of abusive head trauma—head injuries inflicted on A.R.—and not the result of an accident. A.R. remained in the hospital until September 30.

On October 5, A.R. returned to Children's Medical Center in Dallas where Dr. Ye-Guang He, a pediatric ophthalmologist with a subspecialty in retinas, performed surgery on her eyes. The surgery revealed extensive multi-layer hemorrhaging in A.R.'s retinas that was so severe that it extended beyond the retinas into the vitreous cavity, the gel inside the eyeball. During the surgery, Dr. He was able to clean the vitreous hemorrhaging and the preretina hemorrhage. He was unable to clean the hemorrhaging in the intraretina and the subretina because it would have caused damage to A.R.'s retinas. During the surgery, Dr. He was able to get a good view to the back of A.R.'s eyes and realized that her prognosis was very poor. He determined that A.R. was blind and was unlikely to regain useful vision.

Dr. Reeder examined A.R. again on January 26, 2017. Her observations corroborated Dr. He's prognosis. A.R. was unable to track objects and never focused on anything. She also determined that A.R. was developmentally delayed. A.R. had been receiving therapy multiple times a week to help her achieve age-appropriate development. Dr. Reeder opined that it was too soon to say what the extent of A.R.'s

mental injury or deficiency would be. She explained that because the abusive head trauma essentially left holes in A.R.'s brain, A.R. would never be completely normal and would always be at risk for seizure.

Detective James Phelan, an officer assigned to the Family Violence Division of the Plano Police Department, investigated this matter. After obtaining an affidavit from Dr. Reeder stating that it was her opinion that A.R. was the victim of an inflicted injury, Detective Phelan obtained an arrest warrant for appellant. A grand jury indicted appellant on two counts: Count I—knowingly causing serious bodily injury to A.R., and Count II—knowingly causing serious mental deficiency, impairment, and injury to A.R. Appellant pled not guilty. A jury convicted appellant as charged, found that a deadly weapon was used, and assessed punishment on each count of sixteen years. After appellant's motion for new trial and amended motion for new trial were overruled, he filed this appeal.

## II. DISCUSSION

### A. DOUBLE JEOPARDY

Appellant contends that his convictions under penal code subsections 22.04(a)(1) and (2) violate double jeopardy because he was convicted and punished twice for the same conduct and the same injury. The Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, shields defendants against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3)

multiple punishments for the same offense stemming from a single prosecution. *See Evans v. State*, 299 S.W.3d 138, 140–41 (Tex. Crim. App. 2009) (citing *Brown v. Ohio*, 432 U.S.161, 165 (1977)); *see also* U.S. CONST. amends. V, XIV. The Texas Constitution provides substantially identical protections. TEX. CONST. art. 1, § 14; *see State v. Blackshere*, 344 S.W.3d 400, 405 n.8 (Tex. Crim. App. 2011). "A double jeopardy claim based on multiple punishments arises when the State seeks to punish the same criminal act twice under two distinct statutes under circumstances in which the Legislature intended the conduct to be punished only once." *Shelby v. State*, 448 S.W.3d 431, 435 (Tex. Crim. App. 2014).

To determine whether there have been multiple punishments for the same offense, we begin with the "same elements" test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932). "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id*. at 304. Texas has adopted a modified *Blockburger* test, described as a "cognate-pleadings approach," to determine when two offenses contain the same elements. *See Bigon v. State*, 252 S.W.3d 360, 370 (Tex. Crim. App. 2008). "Under the cognate-pleadings approach adopted by this Court, double-jeopardy challenges should be made even to offenses that have differing elements under *Blockburger*, if the same 'facts required' are alleged in the indictment." *Id*. If two offenses require proof of different facts, there is a rebuttable

presumption that the offenses are different for double jeopardy purposes. *Ex parte Benson*, 459 S.W.3d 67, 72 (Tex. Crim. App. 2015).

"Application of *Blockburger* does not serve, however, to negate otherwise clearly expressed legislative intent." *Villanueva v. State*, 227 S.W.3d 744, 747 (Tex. Crim. App. 2007). The *Blockburger* test "operates only as a rule of statutory construction, a mechanism for determining legislative intent." *Id*. In *Ervin v. State*, the Texas Court of Criminal Appeals clarified that "the *Blockburger* test cannot authorize two punishments where the legislature clearly intended only one." 991 S.W.2d 804, 807 (Tex. Crim. App. 1999). The *Ervin* court also promulgated a non-exclusive list of factors to consider when determining whether the legislature intended to punish conduct only once, even though the conduct violated separate statutory provisions. *Id*. at 814. These factors include: (1) whether the offenses are in the same statutory section; (2) whether the offenses are phrased in the alternative; (3) whether the offenses are named similarly; (4) whether the offenses have common punishment ranges; (5) whether the offenses have a common focus; (6) whether the common focus tends to indicate a single instance of conduct; (7) whether the elements that differ between the two offenses can be considered the same under an imputed theory of liability that would result in the offenses being considered the same under *Blockburger*; and (8) whether there is legislative history containing an articulation of an intent to treat offenses as the same for double jeopardy purposes. *Id*.

Both of appellant's convictions were for offenses under penal code section 22.04(a). Under section 22.04(a), a person commits the offense of injury to a child if he "intentionally, knowingly, recklessly, or with criminal negligence, by act" causes to a child (1) serious bodily injury; (2) serious mental deficiency, impairment, or injury; or (3) bodily injury. TEX. PENAL CODE § 22.04(a). In the indictment, Count I alleged that appellant committed the offense of knowingly causing serious bodily injury to A.R., a child under the age of fourteen. Count II alleged that appellant committed the offense of knowingly causing serious mental deficiency, impairment, and injury to A.R., a child under the age of fourteen. Applying the *Blockburger* test and the *Ervin* factors, we note that the indictment alleges that appellant violated two subsections within the same subsection of the same statute—penal code section 22.04(a)(1) and (2). The subsections are phrased in the alternative. The punishment range is identical. *See* TEX. PENAL CODE § 22.04(e). The indictment lists identical manner and means for both counts. The indictment did not allege two separate and distinct incidents of injury, and the "facts required" that were alleged in the indictment were exactly the same. *See Bigon*, 252 S.W.3d at 370.

In *Jefferson v. State*, the Texas Court of Criminal Appeals noted that "the essential element or focus of the statute [section 22.04(a)] is the result of the defendant's conduct . . . and not the possible combinations of conduct that cause the result." 189 S.W.3d 305, 312 (Tex. Crim. App. 2006). Injury to a child is a result-oriented offense. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App.

2007); *Villanueva*, 227 S.W.3d at 748. This means that the child's injury forms the "gravamen of the offense" or the "allowable unit of prosecution." *See Bigon*, 252 S.W.3d at 371–72; *Villanueva*, 227 S.W.3d at 748. Because it is the child's injury that defines the offense, the State may not obtain two convictions against a defendant for causing the same injury. *Villanueva*, 227 S.W.3d at 748.

The State argues that A.R. suffered two distinct injuries: (1) retinal hemorrhaging that resulted in blindness—Count I, and (2) developmental and cognitive delays—Count II. However, the evidence at trial did not establish that appellant committed two separate and distinct incidents of injury to A.R. on the day she was injured. The State's theory of the case was that A.R. suffered non-accidental abusive head trauma caused by a whip-lash type movement of the baby's head. Dr. Reeder opined that this type of movement could have been caused by shaking or dropping A.R. on something soft, such as a couch or mattress, which would not leave a mark on the skin. The abusive head trauma was so severe that it resulted in more than one medical condition. To establish serious bodily injury, the State presented testimony from Dr. He that the abusive head trauma caused the severe hemorrhaging in A.R.'s retinas. To establish serious mental deficiency, impairment, or injury, the State offered testimony from Dr. Reeder that the abusive head trauma caused the holes in A.R.'s brain that delayed her development and may have caused cognitive impairment. The abusive head trauma was the injury underlying all of A.R.'s medical issues.

–10–

Neither party has referred us to a case that specifically analyzes whether serious bodily injury and serious mental deficiency, impairment, or injury are the same for double jeopardy purposes. However, the Texas Court of Criminal Appeals has analyzed legislative intent regarding this statute in related ways. *See Villanueva*, 227 S.W.3d at 747 (double jeopardy); *Stuhler v. State*, 218 S.W.3d 706 (Tex. Crim. App. 2007) (jury unanimity). In *Villanueva*, the Texas Court of Criminal Appeals concluded that punishing the appellant in the same proceeding for injury to a child by act and injury to a child by omission (failing to seek medical treatment) violated his double-jeopardy protection. 227 S.W.3d at 747. In its analysis, the court discussed whether the State could obtain two separate convictions for two violations of the same statutory provision on the same day and concluded that it was conceivable—so long as the State could prove that two separate and discrete incidents occurred on that day comprising two violations of the same statutorily defined offense. *Id*. at 748. In a concurring opinion, Justice Cochran elaborated:

> In "shaken baby" cases, it is conceivable that the State could obtain two separate convictions for two separate serious bodily injuries. If the evidence clearly showed that the affirmative act of shaking the baby caused one specific injury (e.g., retina detachment, broken ribs, temporary brain swelling), and that the failure to seek immediate medical attention for that original injury caused death (or permanent brain damage) *which otherwise would not have occurred but for the failure to take the child to the hospital*, these are two discrete serious bodily injuries.

*Id*. at 752 (emphasis added). Here, the analysis necessarily differs because the State did not allege, and the evidence did not establish, that appellant caused serious bodily

–11–

injury to A.R. by act and omission. However, applying the *Villanueva* analysis to the case before us, we conclude that the State did not prove two separate and distinct incidents of injury. A.R.'s injury was non-accidental abusive head trauma caused by a whip-lash type movement of her head. This single injury caused both the hemorrhaging in A.R.'s retinas and the holes in A.R.'s brain. Accordingly, on the particular facts of this case, appellant cannot be punished twice for medical conditions caused by one incident of injury to A.R.

We conclude that punishing appellant in the same proceeding for causing serious bodily injury to a child and causing serious mental deficiency, impairment, and injury to a child violated his double jeopardy protection. The remedy is to retain the "most serious" offense—the offense for which the jury assessed the highest punishment—and set aside the other. *See Bigon*, 252 S.W.3d at 372; *Villanueva*, 227 S.W.3d at 749. In this case, the jury assessed an identical term of years for each conviction. No fine or restitution was assessed for either conviction. The trial court entered an affirmative finding of use of a deadly weapon in the judgment of conviction for both counts. Under these circumstances, we conclude that the conviction for injury to a child by causing serious mental deficiency, impairment, and injury (Count II) should be vacated. We sustain appellant's first issue.

## B. SUFFICIENCY OF THE EVIDENCE

In his second issue, appellant argues, in the alternative, that the evidence is legally insufficient to support his conviction for Count II. We do not address this

issue because we conclude above that appellant's conviction for Count II should be vacated. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

## C. WITNESS TESTIMONY

In his third and sixth issues, appellant complains about the admission and exclusion of evidence. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). The trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer*, 569 S.W.3d at 669 (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). We will not reverse the trial court's ruling unless it falls outside the zone of reasonable disagreement. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018).

### 1. Witness Testimony of Cathy Carter

Appellant contends the trial court erred in overruling his many confrontation clause, due process, and hearsay objections to the testimony of Cathy Carter, A.R.'s court-appointed special advocate (CASA). In response, the State asserts that appellant failed to preserve his confrontation clause claim for review because the argument he makes on appeal does not comport with his objection at trial. Further,

the State asserts that any non-verbal statement from A.R. was non-testimonial, and Carter testified and was cross-examined at trial.

Under the Confrontation Clause of the Sixth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Supreme Court has interpreted this right to mean that "testimonial" evidence is inadmissible at trial unless the witness who made the statement either takes the stand to be cross-examined or is unavailable and the defendant had a prior opportunity to cross-examine him. *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004); *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013). "While the exact contours of what is testimonial continue to be defined by the courts, such statements are formal and similar to trial testimony." *Burch*, 401 S.W.3d at 636. Testimonial statements include: (1) "ex parte in-court testimony or its functional equivalent," i.e., "pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements contained in formalized testimonial materials," such as affidavits, depositions, or prior testimony; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010) (citing *Wall v. State*, 184 S.W.3d 730, 735 (Tex. Crim. App. 2006)). When considering whether a statement is testimonial or non-

–14–

testimonial, we give almost total deference to the trial court's determination of historical facts and review de novo the trial court's application of the law to those facts. *Wall*, 184 S.W.3d at 742 (applying hybrid standard of review to issue of whether statement was testimonial); *Mason v. State*, 225 S.W.3d 902, 906–07 (Tex. App.—Dallas 2007, pet. ref'd) (same). The admission of non-testimonial hearsay does not violate the Confrontation Clause. *Sanchez v. State*, 354 S.W.3d 476, 485 (Tex. Crim. App. 2011).

During trial, the State called Carter to testify about her observations during A.R.'s initial hospitalization and A.R.'s eye surgery. Carter was also asked about a video of appellant and A.R.[3] Most of appellant's objections pertained to Carter's testimony about the video.[4] Carter testified that she saw a short video of appellant and A.R. She did not have a copy of the video, and she only watched it one time. She identified State's Exhibit 12 as a screen shot of the beginning of the video. She believed that the video was taken at or around the same time A.R. was injured, and she explained that the marks on A.R.'s face in the video were the same marks that were on her face when Carter first saw her in the hospital. She also stated that A.R. appeared to be the same size in the video as she was in the hospital. The State offered State's Exhibit 12 into evidence; defense counsel objected on the basis of objections

---

[3] The video is missing; it was lost or stolen before it could be copied.

[4] The trial court first considered Carter's anticipated testimony during a hearing outside the presence of the jury. Defense counsel made numerous objections, including objections that Carter's testimony was hearsay, and objections that appellant was denied his right of confrontation with regard to the video.

made outside the presence of the jury. The court overruled the objection and entered the photograph into evidence.

When the State asked Carter to describe for the jury what she had observed in the video, defense counsel objected on the basis of due process, stating "it denies our right to confront this witness." The court overruled the objection. Carter then testified that the video showed appellant with his hand around A.R.'s neck, and he was shaking her. Carter testified that A.R. was screaming, her mouth was open, and her eyes were wide. Carter then stated that A.R. was scared, she was afraid. The trial court sustained appellant's objection that Carter's testimony related how someone else felt. The State asked, "Not knowing what was in her head, what did she appear to look like?" Carter testified that A.R. appeared to look like she was afraid and scared. Defense counsel's "same objection" was overruled.

The State asked Carter to describe how hard appellant was shaking A.R. Defense counsel objected to Carter's descriptions of the shaking "based on State's Exhibit 12" and "confrontation." The trial court overruled these objections, and Carter testified that appellant was violently shaking A.R. during most of the video.

Defense counsel cross-examined Carter about the video and State's Exhibit 12, the screen shot of the beginning of the video. Carter agreed that she did not know the date that the video was made. Although defense counsel suggested that Carter's perceptions of the video were filtered by her role as A.R.'s advocate, she disagreed and stated that was what she saw on the video.

At trial, appellant's confrontation clause objections appeared to focus on his right to confront Carter. He objected that he was denied his right of confrontation because he had not seen, and did not have access to, the full video in order to be able to cross-examine Carter about the contents. On appeal, appellant expanded his confrontation clause objections to assert he was denied the right to confront the proponent of the verbal expressions or their equivalent (A.R) because she was unavailable to testify.[5] He argues that the court should not have allowed Carter to testify that A.R. looked afraid and scared because such testimony described what Carter thought A.R. was trying to express if only she could. Appellant argues that such testimony was inadmissible hearsay.

It is not clear from the record that the trial court understood that appellant's trial objection that he was denied his right of confrontation was intended to mean his right to confront A.R. about the expression on her face. To be preserved for appellate review, defendant's claim on appeal must comport with objection preserved in the trial court. *See Hallmark v. State*, 541 S.W.3d 167, 171 (Tex. Crim. App. 2017). For appellant's complaint on appeal to comport with the specific complaint that was lodged with the trial court, "[t]he appellant must have conveyed to the trial court the particular complaint raised on appeal, including the precise and proper application of law as well as the underlying rationale." *Bleimeyer v. State*, 616 S.W.3d 234, 250

---

[5] A.R. was approximately two-and-a-half years old at the time of trial.

(Tex. App.—Houston [14th Dist.] 2021, no pet.). However, even if appellant's confrontation clause objection was preserved for appellate review, the trial court did not abuse its discretion in allowing Carter to testify about the video.

Nonverbal conduct is considered hearsay only when it is an assertive substitute for verbal expression. *See Foster v. State*, 779 S.W.2d 845, 862 (Tex. Crim. App. 1989); *see also* TEX. R. EVID. 801(a) ("statement" means person's oral or written verbal expression, or nonverbal conduct that a person intended as a substitute for verbal expression). For example, conduct may be a substitute for verbal expression if the declarant is asked a specific question and responds assertively to that question in a nonverbal manner. *See Foster*, 779 S.W.2d at 862; *McMinn v. State*, 558 S.W.3d 262, 269 (Tex. App.—Houston [14th Dist.] 2018, no pet.). However, demeanor and overall behavior are not an assertion and are not considered a statement for purposes of the hearsay rule. *See Foster*, 779 S.W.2d at 862; *Reynolds v. State*, Nos. 05-92-01709-CR to 05-92-01712-CR, 1994 WL 95480, at *4 (Tex. App.—Dallas Mar. 21, 1994, no pet.) (not designated for publication) (stating that police officer's testimony that abused wife was scared to talk to police simply stated conclusion he drew after witnessing her demeanor and overall behavior and was not hearsay because her demeanor and overall behavior could not be considered an assertion by her).

The trial court considered every aspect of Carter's proposed testimony in a lengthy hearing outside the presence of the jury and, after considering all of defense

counsel's objections, limited Carter's testimony to what she saw. She was instructed that she could not testify about her own personal feelings as she watched the video. And she was not to provide her own interpretation of how A.R. might be feeling during the video. The record demonstrates that, for the most part, Carter followed the trial court's instructions during her testimony before the jury. The record also establishes that defense counsel cross-examined Carter about the video.

We conclude that Carter's testimony about the video did not introduce any out-of-court statement by A.R. Instead, it simply stated conclusions drawn by Carter after witnessing A.R.'s demeanor and behavior on the video. A.R.'s facial expression was not a statement for purposes of the hearsay rule. *See Foster*, 779 S.W.2d at 862. The trial court did not act outside the zone of reasonable disagreement by overruling appellant's hearsay objection to the video because the trial court reasonably could have believed that the expression on A.R.'s face did not contain a "statement." *See Rhomer*, 569 S.W.3d at 669. Accordingly, the trial court did not violate appellant's Sixth Amendment right of confrontation by allowing Carter to testify about what she saw on the video of appellant and A.R. *See Burch*, 401 S.W.3d at 636. We overrule appellant's third issue.

### 2. Expert Witness Testimony of Dr. Scheller

Appellant retained Dr. Joseph Scheller as a forensic consultant to review A.R.'s medical records to see if there was an alternative explanation for her injuries. At trial, Dr. Scheller opined that A.R.'s injuries were "more consistent with small

–19–

venous strokes than with brain contusions from trauma or violence." In his sixth issue, appellant complains that the trial court micromanaged and limited Dr. Scheller's testimony by refusing to allow Dr. Scheller to testify regarding certain topics on which he was fully qualified to testify. The State contends that appellant failed to preserve his complaint for appellate review because he failed to make an offer of proof showing what substantive evidence was excluded from the jury.

For expert testimony to be admissible, its proponent must demonstrate by clear and convincing evidence that the testimony is sufficiently reliable and relevant to help the jury reach accurate results. *See* TEX. R. EVID. 702; *Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017). There are three requirements for the admission of expert testimony: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). These requirements are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Rhomer*, 569 S.W.3d at 669; *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010).

The specialized knowledge that qualifies a witness to offer an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a combination of these things. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). "A witness must first have a sufficient background in a particular field,

–20–

but a trial judge must then determine whether that background 'goes to the very matter on which [the witness] is to give an opinion.'" *Vela*, 209 S.W.3d at 131 (quoting *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)). "Fit" is a component of the qualification requirement, and "the expert's background must be tailored to the specific area of expertise in which the expert desires to testify." *Id*. at 133. "The party offering expert testimony has the burden to show the witness is qualified on the matter in question." *Rhomer*, 569 S.W.3d at 669.

The record establishes that the trial court carefully examined Dr. Scheller's qualifications.[6] Dr. Scheller testified that he has practiced medicine for thirty-one years. He is board certified in pediatrics and neurology with a focus in pediatric neurology.[7] Dr. Scheller testified that as a neurologist, he frequently reads and reviews radiology reports, CT scans, and MRI scans. He further explained that although he is not a radiologist, he has an additional certification in brain and spine imaging from the United Council of Neurologic Subspecialties.[8] With respect to A.R., Dr. Scheller testified that he had reviewed all of A.R.'s medical records, including the CT scans from September 19 and 20, and the MRI scans from September 21, October 20, and December 16.

---

[6] During a lengthy hearing outside the presence of the jury, the State objected to Dr. Scheller's providing expert testimony in the medical specialties of radiology and ophthalmology. The court determined that Dr. Scheller could testify as to the areas proffered in the hearing. However, the court cautioned the parties that testimony by a medical expert should be tailored to the expert's specific area of expertise. The court indicated that it would take objections on a question-by-question basis.

[7] Dr. Scheller received board certification from the American Board of Medical Specialties.

[8] This specialty certification has not been recognized by the American Board of Medical Specialties.

On appeal, appellant complains that the trial court erred when it sustained five of the State's objections during Dr. Scheller's testimony. To preserve a complaint regarding the trial court's exclusion of evidence, the defendant must make an offer of proof setting forth the substance of the proffered evidence, unless the substance is apparent. TEX. R. EVID. 103(a)(2); *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009). Appellant concedes that he did not make an offer of proof. But he asserts that the rule 705 hearing was "so extremely intensive and thorough" that an offer of proof was not necessary to show Dr. Scheller's opinions.

The State agrees that Dr. Scheller's opinions were thoroughly explored in the hearing. However, the State contends Dr. Scheller's testimony in front of the jury was consistent with his proffered testimony at the hearing. Therefore, with respect to any testimony excluded by the sustained objections during trial, the State argues that the substance was not apparent and that an offer of proof was still required.

"The primary purpose of an offer of proof is to enable an appellate court to determine whether the exclusion was erroneous and harmful. A secondary purpose is to permit the trial judge to reconsider his ruling in light of the actual evidence." *Mays*, 285 S.W.3d at 890. According to the record, Dr. Scheller's testimony to the jury appears to include his opinion in each of the areas that appellant now complains were prohibited. It was appellant's responsibility to ensure that the substance of the excluded evidence was placed into the record, but he failed to do so. *See id.* at 891.

Although appellant argues that Dr. Scheller was not allowed to answer Appellant's questions or follow-up questions, none of the sustained objections significantly limited Dr. Scheller's expert testimony. Indeed, the record reveals that some of the objections were sustained because of the wording of the questions posed to Dr. Scheller, or his answers in response. At times, Dr. Scheller had difficulty limiting his answers to "yes" or "no" when asked questions that should have elicited a yes or no answer. For example, appellant complains that the trial court erred in sustaining the State's objection when he asked Dr. Scheller, "Any external scalp damage?" However, in response to the question, Dr. Scheller responded, "No. On the CAT scan, the – in addition to showing –." At that point, the State objected that Dr. Scheller's answer was nonresponsive and the trial court sustained the objection. Defense counsel followed with a series of questions that allowed Dr. Scheller to complete his discussion of what he saw on the CT scan.

Other questions posed by defense counsel invited Dr. Scheller to expand his testimony beyond his specific areas of expertise. *See Vela*, 209 S.W.3d at 133. After Dr. Scheller testified extensively about retinal hemorrhaging and its connection to brain circulation, he was asked what retinal hemorrhaging told him, and what his medical opinion was with respect to the retinal hemorrhaging. The State objected that these questions solicited opinions that were outside the scope of Dr. Scheller's expertise, and the court sustained the objections. After defense counsel asked foundational questions to establish Dr. Scheller's experience in diagnosing retinal

hemorrhaging as a pediatric neurologist, he was allowed to opine that A.R.'s retinal hemorrhaging was consistent with increased intracranial pressure. He also discussed and disagreed with Dr. He's testimony that there were contusions in A.R.'s brain that would suggest child abuse, testifying that he did not see signs and symptoms of contusions in A.R.'s December MRI scans.

Appellant complains that the trial court sustained the State's objection of "outside the scope" when Dr. Scheller was asked if fluid on the MRI scan of A.R.'s neck was indicative of abuse. However, once the question was re-worded, Dr. Scheller was allowed to opine that the presence of fluid did not tell him anything with respect to whether there was abuse. Appellant also complains that the trial court sustained the State's objection of "outside the scope of his expertise" when defense counsel asked Dr. Scheller what his opinion was, based on a reasonable degree of medical certainty. Once counsel re-phrased the question to ask, "As a pediatric neurologist and a pediatrician, do you have an opinion regarding - - a medical opinion regarding [A.R.]," The trial court permitted Dr. Scheller to give his medical opinion that A.R.'s injuries were more consistent with small venous strokes than with brain contusions from trauma or violence.

The trial court is the gatekeeper against expert testimony that does not help the trier of fact. *See Rhomer*, 569 S.W.3d at 670. A trial court's ruling on the admissibility of expert testimony will rarely be disturbed on appeal. *Buford v. State*, 606 S.W.3d 363, 372 (Tex. App.—Houston [1st Dist.] 2020, no pet). "Because the

possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006). Appellant complains that the trial court micromanaged Dr. Scheller's testimony but as the gatekeeper, that is exactly what the trial court was required to do. *See Rhomer*, 569 S.W.3d at 670.

Even if the trial court erred when it sustained the State's objections to Dr. Scheller's testimony, appellant has failed to show that he was harmed by the exclusion of such evidence. "The erroneous exclusion of a defendant's evidence generally constitutes non-constitutional error unless the excluded 'evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense.'" *Delapaz v. State*, 228 S.W.3d 183, 202 (Tex. App.—Dallas 2007, pet. ref'd) (quoting *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002)). Non-constitutional error that does not affect substantial rights must be disregarded. *See* TEX. R. APP. P. 44.2(b). Substantial rights are not affected by the erroneous exclusion of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). Because the record establishes that Dr. Scheller was not prohibited from providing the expert testimony that formed a vital part of appellant's defense, and because appellant failed to ensure that the substance of the excluded evidence was placed into the

record, we conclude that appellant was not harmed by any error in sustaining the State's objections. We overrule appellant's sixth issue.

## D. IMPROPER JURY ARGUMENT

During the State's closing argument in the guilt/innocence phase of the trial, the prosecutor stated:

> They want to paint the Defendant as this loving and caring father. He is not the biological father. He initially didn't want this baby, remember? Initially. It was only after his then girlfriend, then wife . . .

Defense counsel objected, requested an instruction to disregard, and moved for a mistrial. The trial court sustained the objection, instructed the jury to disregard the last statement by the prosecutor, and denied appellant's request for a mistrial. In his fifth issue, appellant asserts that the trial court erred by refusing to grant a mistrial after sustaining appellant's objection that the prosecutor was arguing outside the record.

We review a trial court's ruling on a motion for mistrial for abuse of discretion. *Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011). We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).

A mistrial is an appropriate remedy in "extreme circumstances" for a narrow class of highly prejudicial and incurable errors. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). A mistrial halts trial proceedings when error is "so

prejudicial that expenditure of further time and expense would be wasteful and futile." *Id*. (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). Whether an error requires a mistrial must be determined by the particular facts of the case. *Ocon*, 284 S.W.3d at 884. Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required. *Id*.

To determine whether the trial court abused its discretion in denying a mistrial for improper jury argument, we consider (1) the severity of the misconduct and magnitude of the prejudicial effect, (2) the curative measures taken, and (3) the certainty of conviction absent the misconduct. *Archie*, 340 S.W.3d at 739 (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)); *see also Ramon v. State*, 159 S.W.3d 927, 929 (Tex. Crim. App. 2004). We first weigh the severity of the misconduct.

Appellant complains that the only evidence of motive during the guilt/innocence phase of trial was supplied by the prosecutor during her opening[9] and closing arguments. He asserts that there is no evidence in the record that he was not A.R.'s biological father or that he did not want the baby, and he accuses the prosecutor of testifying to these facts. He argues that by becoming a material witness against him, the prosecutor engaged in severe misconduct. We disagree. The severity

---

[9] During the State's opening statement, the prosecutor explained that A.R.'s family structure was complicated. She explained that appellant and Natalie were dating but they broke up, in part because Natalie wanted to have a baby but appellant was not ready. During the break-up, Natalie became pregnant with A.R. through in-vitro fertilization. She and appellant later reconciled, got married, and planned to raise A.R. together as a family. Appellant did not object to the State's opening statement.

–27–

of the misconduct, or the magnitude of the prejudicial effect of the prosecutor's statement, was low. *See Archie*, 340 S.W.3d at 739. The jury heard the same information, without objection, during opening statement. During closing, before defense counsel objected, the prosecutor had already noted, and repeated, that appellant did not want the baby *initially*. The prosecutor's next statement was interrupted mid-sentence. But given the prosecutor's emphasis on the word "initially," and her following statement that began "it was only after," the jury could have inferred that after A.R. was born, appellant changed his mind about wanting the baby.

Second, we assess the efficacy of any curative measures taken by the trial court. *See id.*; *see also Mosely*, 983 S.W.2d at 259. A prompt instruction to disregard ordinarily cures any resulting harm. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *Griffin v. State*, 571 S.W.3d 404, 417 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). We presume the jury will heed the trial court's instructions, curing any harm from improper argument. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *Wesbrook*, 29 S.W.3d at 116. Here, not only did the trial court immediately instruct the jury to disregard the prosecutor's last statement, it also included the following language in the jury charge:

> You are instructed that any statements of counsel made during the course of the trial or during argument not supported by the evidence, or statements of laws made by counsel not in harmony with the law as stated to you by the Court in these instructions, are to be wholly disregarded.

*See Hawkins*, 135 S.W.3d at 84 (analysis of this factor should consider instructions given in jury charge); *Orcasitas v. State*, 511 S.W.3d 213, 224 (Tex. App.—San Antonio 2015, no pet.) (trial court's instruction to jury that only law it should depend on was law in jury charge itself cured improper argument); *Williams v. State*, 417 S.W.3d 162, 179 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (considering as curative measures, that trial court's "written jury instructions again advised the jury that it should not 'consider, discuss, nor relate any matters not in evidence'"). Based on the record before us, we conclude that the prosecutor's statement was not so extreme that the trial court's curative instructions were ineffective.

The third factor—the strength of the evidence supporting the conviction—also supports a conclusion that the trial court did not abuse its discretion in denying the motion for mistrial. *See Archie*, 340 S.W.3d at 739; *Mosley*, 983 S.W.2d at 259. The record contains compelling evidence of appellant's guilt, including Dr. Gusterloh's testimony that A.R. was a healthy baby when appellant brought her to her doctor's appointment on the morning of September 19, 2016, Dr. Cooper's testimony as to A.R.'s condition when she arrived in the emergency room at Children's Medical Center that evening, and Detective Phelan's testimony that appellant was A.R.'s sole caregiver that day. The record also contains Dr. Reeder's and Dr. He's testimony about the extent of A.R.'s injuries and their opinions as to the cause of those injuries. Having reviewed the entire record, we find no indication

that the mere mention that appellant was not A.R.'s biological father and did not initially want a baby, without explanation or argument, caused the jury such confusion as to undermine appellant's conviction.

All three of the *Mosley* factors weigh heavily in favor of the State. Accordingly, we conclude the trial court did not abuse its discretion in denying appellant's motion for mistrial. We overrule appellant's fifth issue.

### E. JURY CHARGE

In his fourth and seventh appellate issues, appellant complains about errors in the jury charge. In reviewing jury-charge error, we must first determine whether error exists. *See Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we find error, we must then determine whether the error caused sufficient harm to require reversal. *Ngo*, 175 S.W.3d at 743. The standard of review differs depending on whether the defendant made a timely objection at trial. *See Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020). If the error was the subject of a timely objection, reversal is required if there is some harm to the defendant as a result of the error. *See* TEX. CODE CRIM. PROC. ANN. art. 36.19; *Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020). If no proper objection was made at trial, reversal is required only if the error is so egregious that the defendant was denied a fair and impartial trial. *Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019).

### 1. *Alternate Theories of Manner and Means*

In appellant's fourth issue, he complains that the trial court erred by failing to require that the State elect the manner and means by which A.R. was injured. He argues that the State failed to prove one of the alleged manners and means—the allegation that he caused A.R. to strike a couch. He argues that there was no evidence that he possessed or owned a couch; therefore, this manner and means was not supported by the evidence and should not have been included in the jury charge.

A trial court must deliver to the jury a written charge distinctly setting forth the law applicable to the case. CRIM. PROC. art. 36.14. The Court's instructions must apply the law to the facts adduced at trial. *Gray v. State*, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004). A court should only include alternate theories of how a defendant committed an offense alleged in an indictment if the evidence presented at trial supports those theories. *See Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012). Neither the manner nor means need be unanimously agreed upon by a jury. *See Ngo*, 175 S.W.3d at 746.

The indictment alleged that appellant caused the offense of knowingly causing serious bodily injury to A.R. (Count I) and knowingly causing serious mental deficiency, impairment, and injury to A.R. (Count II) by: (1) shaking, throwing, striking, or dropping A.R. with defendant's hands and arms; or (2) causing A.R. to strike a couch, mattress, or object unknown to the Grand Jury; or (3) by manner and means unknown to the Grand Jury. The jury charge tracked the indictment, providing

the jury with the same three theories of causation for both counts. In his appellate brief, appellant concedes that the State proffered evidence of all other alleged manners and means; he only complains that the jury instruction included the word "couch."[10]

The second proposed manner and means alleges appellant knowingly caused A.R. to strike a couch, mattress, and object unknown to the Grand Jury. Instead of considering this manner and means as a whole, appellant seems to argue that this theory of causation should be separated into three distinct theories, alleging that: (1) appellant caused A.R. to strike a couch; (2) appellant caused A.R. to strike a mattress; or (3) appellant caused A.R. to strike an unknown object. He further argues that the State was required to proffer evidence for each of these subcategories. Our reading of the theory of causation does not persuade us that causing A.R. to strike a couch is a separate and distinct manner and means, nor are we persuaded that the State was required to proffer evidence that appellant caused A.R. to strike a couch.[11] Furthermore, assuming the trial court should have limited the second theory of causation instruction to mattress and unknown object, appellant cannot establish he

---

[10] In his brief, appellant states "Appellant concedes for the sake of this appeal the State proffered evidence Appellant injured A.R. with his hands – and/or proffered evidence he injured her in a manner and means unknown – and/or he injured A.R. by throwing her on a mattress."

[11] We note that appellant has not made a similar argument with respect to the first theory of causation— that appellant caused injury by shaking, throwing, striking and dropping A.R. with his hands and arms. Appellant does not argue that the State was required to proffer separate evidence of shaking, throwing, striking, and dropping. Indeed, he considered each as part of the theory of causation, and conceded that the State proffered evidence that appellant injured A.R. with his hands.

suffered some harm as a result of the inclusion of the word "couch" in the second theory of causation instruction.[12] *Sanchez*, 376 S.W.3d at 774.

"In a jury charge alleging alternative theories, harm must be measured, 'at least in part, against the likelihood that the jury's verdict was actually based upon an alternative available theory of culpability not affected by erroneous portions of the charge.'" *Id*. at 775 (quoting *Atkinson v. State*, 923 S.W.2d 21, 27 (Tex. Crim. App. 1996), *overruled on other grounds by Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002)). "When a jury returns a general guilty verdict on an indictment charging alternative methods of committing the same offense, the verdict stands 'if the evidence is sufficient to support a finding under any of the theories submitted.'" *Id*. (quoting *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991)). The presence of overwhelming evidence of guilt plays a determinative role in resolving the issue and may be considered when assessing jury-charge error. *Id*.

Considering the entire record, we conclude that the jury charge, if erroneous, did not result in "actual harm" to appellant. The alternatives for convicting appellant required the jury to be convinced beyond a reasonable doubt that appellant caused serious injury to A.R., and the evidence at trial established this. In addition, the evidence proved at least one of the alternatives in the jury instruction that permitted a finding of guilt for serious bodily injury to A.R. The testimony at trial established

---

[12] Appellant made a timely objection to the inclusion of the word "couch" in the jury instruction. Consequently, in addition to establishing error, appellant must demonstrate that he suffered some harm to obtain reversal of the judgment. *Sanchez*, 376 S.W.3d at 774.

that A.R. suffered abusive head trauma while she was in the sole care and custody of appellant. Dr. Reeder testified that A.R.'s injuries were the result of a whip-lash type mechanism such as actual, violent shaking, slamming A.R. onto a soft surface such as a bed or couch, swinging A.R. around, or shaking her from side to side. This evidence was sufficient to support appellant's conviction under the first theory of causation that he shook, threw, struck, or dropped A.R. with his hands and arms. Accordingly, appellant was not harmed by the inclusion of the word "couch" in the instruction. We overrule appellant's fourth issue.

## 2. *Deadly Weapon Special Issue*

In his seventh issue, appellant argues that the trial court erred by submitting only one deadly weapon special issue for two separate counts. The jury charge states:

> Only if you have found the defendant guilty of one or more of Counts I and II, alleged to have been committed on or about the 19th day of September, 2016, then you are further instructed to answer the following special issue:

> Do you find beyond a reasonable doubt that the defendant used or exhibited a deadly weapon during the commission of the offense for which you have found him guilty?

> Select one answer. "Yes" or "No"

> In answering this question, you are instructed that a "Deadly Weapon" means anything that in the manner of its use or intended use is capable of causing death or serious bodily injury, to-wit: the defendant's hand(s).

> You are further instructed that your answer to this special issue must be unanimous.

Appellant argues that because the jury was instructed to answer a combined deadly weapon question for both counts as if they were one and the same, it is impossible to know if the jury's answer was unanimous. In response, the State asserts that: (1) appellant cannot show that the trial court erred by only submitting one special issue for both counts, and (2) appellant has not shown or alleged anything more than mere theoretical harm.

The record reflects that in the indictment, both Count I and Count II contain an allegation that defendant used a deadly weapon, his hand(s), during the commission of that offense. In the special issue, the trial court asked the jury to answer this question: "Do you find beyond a reasonable doubt that the defendant used or exhibited a deadly weapon during the commission of *the offense for which you have found him guilty*?" (emphasis added). The jury found appellant to be guilty of both Count I and Count II. Thus, when the jury answered "Yes" to the trial court's special issue question, the jury answered "yes" that appellant used a deadly weapon during the offense set forth in Count I, and "yes" that appellant used a deadly weapon during the offense set forth in Count II. If the jury had not found beyond a reasonable doubt that the defendant used or exhibited a deadly weapon during the commission of either or both of the offenses for which they found him guilty, their answer would necessarily have been "no."

Although the better practice may have been for the trial court to include a separate deadly weapon special issue for each separate count, appellant provides no

authority for his argument that the trial court was required to submit a separate special issue for each count. He complains that it is impossible to know if the jury's answer was unanimous. But he acknowledges that the court instructed the jury that their answer to the special issue had to be unanimous. On appeal, we generally presume that the jury followed the trial court's instructions in the manner presented. *Thrift*, 176 S.W.3d at 224. An appellant may refute this presumption, but he must rebut it by pointing to evidence that the jury failed to follow the instruction. *Id*. Appellant has not identified any such evidence in this case.

Even if the combined special issue was error, appellant has not shown that he was egregiously harmed by such error. Appellant acknowledges that he did not object to the special issue in the jury charge during trial. When a defendant fails to object to the court's charge, any charge error will not result in reversal of the conviction without a showing of egregious harm that deprived the defendant of a fair and impartial trial. *Chambers*, 580 S.W.3d at 154. Such harm must be actual and not merely theoretical. *Id*. Charge error is considered egregiously harmful when it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Ngo*, 175 S.W.3d at 750. "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). Overwhelming evidence of guilt plays a determinative role in resolving the issue and may be

considered when assessing jury-charge error. *Sanchez*, 376 S.W.3d at 775. In examining the record for egregious harm, we consider the entire jury charge, the state of the evidence, the closing arguments of the parties, and any other relevant information in the record. *Villarreal*, 453 S.W.3d at 433.

Appellant argues that this jury charge error affected his parole eligibility and how he would be treated in prison. However, appellant provides no further explanation, argument, or citation to the record or authorities to show how he was actually harmed. We conclude that the record fails to support a conclusion that appellant suffered actual, not just theoretical, harm from the trial court's combined special issue instruction. We overrule appellant's seventh issue.

## III. CONCLUSION

We affirm the trial court's judgment in part with respect to appellant's conviction on Count I, knowingly causing serious bodily injury to a child. We reverse the trial court's judgment in part and render judgment vacating appellant's conviction on Count II, knowingly causing serious mental deficiency, impairment, and injury to a child.

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE

190092f.u05

Do Not Publish
TEX. R. APP. P. 47

–37–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SYED SARTAJ NAWAZ, Appellant

No. 05-19-00092-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 199th Judicial District Court, Collin County, Texas Trial Court Cause No. 199-81120-2017.

Opinion delivered by Justice Pedersen, III. Justices Myers and Garcia participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part, and **REVERSED AND RENDERED** in part.

We **REVERSE** the trial court's judgment as to Count II, and **RENDER** judgment vacating appellant's conviction for the offense of knowingly causing serious mental deficiency, impairment, and injury to a child. In all other respects, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 11th day of May, 2021.